■ VARSITY TRANSIT, INC., Appellant, et al., Plaintiff, v FREDERICK SAPORITA, as President of Local Division 1181-1061 of the Amalgamated Transit Union, AFL-CIO, et al., Defendants, and BOARD OF EDUCATION OF THE CITY OF NEW YORK, Respondent.—Appeal by Varsity Transit, Inc., from so much of an order of the Supreme Court, Kings County, dated February 27, 1979, as (1) dismissed its complaint with respect to the defendant board of education pursuant to CPLR 3211 (subd [a], par 7) for failure to state a cause of action, and (2) denied its motion for a preliminary injunction enjoining the defendant board from soliciting and opening bids on certain contracts. Order affirmed insofar as appealed from, with $50 costs and disbursements to respondent. In our opinion, Special Term correctly dismissed the complaint for failure to state a cause of action against the defendant board. We find no illegality in the bid specifications offered by the board and attacked by Varsity in the instant case. While certain labor provisions in the new proposals concerning wage rates and pension benefits, among other things, depart from the provisions which had prevailed in the plaintiffs' prior school bus contracts with the board, such modifications fall clearly within the board's statutory mandate to promote "the best interests of the district" and to "seek, obtain and consider new proposals" concerning contracts for the transportation of school children (Education Law, § 305, subd 14, par a). In view of the board's clear authority and legal duty to modify its bid specifications as required by the public interest, there could be no implicit representation in the board's adoption in the past of certain labor practices that such practices would necessarily survive in future contract proposals. Hence, plaintiffs could not, by entering into prior contracts with the board, place legal reliance upon any such representation, and the argument that the board is now estopped from changing the labor provisions is without merit. The instant complaint of Varsity amounts to an invitation to the court to review the merits of the board's administrative decision to alter its contract proposal. In the absence of any legal justification for doing so, such an invitation must be declined. Similarly, we find no

merit in the contention that the bid specifications worked an illegal discrimination against Varsity. The instant contract proposals are reasonably designed to effectuate the board's duty under the Education Law (§ 305, subd 14) to conduct bidding for school transportation contracts on a competitive basis. The specifications do not limit the possibility of success to a single bidder without reference to the public interest; conversely, they do not make it impossible for Varsity to prevail in the bidding, since Varsity has in fact been awarded those contracts on which it has submitted the lowest responsible bid (see *Gerzof v Sweeney*, 16 NY2d 206, 211; cf. *Edenwald Contr. Co. v City of New York,* 86 Misc 2d 711, affd 47 AD2d 610; *American La France & Foamite Corp. v City of New York,* 156 Misc 2, affd 246 App Div 699). While the new specifications may have the effect of altering Varsity's over-all chances of success, this flows from the nature of competitive bidding, not from invidious discrimination against Varsity on the part of the board. Finally, there is no merit in Varsity's contention that the board's contract proposals violate the "prevailing wage" provisions of section 220 of the Labor Law and section 17 of article I of the New York State Constitution. It is hornbook law that the Labor Law provision applies only to workers involved in the construction, replacement, maintenance and repair of "public works" in a legally restricted sense of that term *(Matter of Pinkwater v Joseph,* 300 NY 729); the school bus drivers and matrons who are the subject of the instant contract proposals do not fall within the class of employees covered by the law (see, also, *Matter of Golden v Joseph,* 307 NY 62; *Matter of Miele v Joseph,* 305 NY 667). Furthermore, section 17 of article I of the State Constitution extends the protection of section 220 of the Labor Law to contractors and subcontractors engaged in "public works", but was not intended to broaden the definition of "public works". We have considered the appellant's remaining contentions and find them to be without merit. Mollen, P. J., O'Connor and Martuscello, JJ., concur.

Titone and Margett, JJ., dissent and vote to reverse the order insofar as appealed from, deny the board's motion to dismiss and grant a preliminary injunction, with the following memorandum: At the center of this litigation are certain new bidding specifications for school bus contracts promulgated by defendant board of education, designed to become effective in September, 1979, which drastically differ from those contained in contracts successfully bid upon by plaintiff Varsity Transit, Inc. (Varsity), from 1965 to 1977. In our opinion, although inartfully drawn, Varsity's complaint states one or more causes of action against the defendant board known to law. Accordingly, at this juncture, the motion by the board to dismiss the complaint under CPLR 3211 should be denied. With respect to Varsity's cause of action predicated on a theory of estoppel, it is alleged that upon the conclusion of each bus transportation contract from 1965 to 1977, the board, *inter alia,* solicited bids for contracts to continue such transportation which included certain obligations that had to be assumed by the ostensible successful low bidder. By their very nature the obligations would continue to legally bind the successful bidder well past the expiration of each transportation contract. The specific obligations that Varsity had to incur as successful bidder on each occasion from 1965 to 1977 were as follows: (1) to hire employees formerly employed by the previous contractor; (2) to pay its employees at a wage rate comparable to that paid by the New York City Transit Authority (Transit Authority) to its employees; and (3) to provide pension and welfare benefits for its employees comparable to those enjoyed by Transit Authority employees engaging in the transportation of children to and from school. Varsity further asserts in its complaint that in reliance

upon the board's implicit representations made during the 13-year period, it continued to hire the employees of the previous contractor and also entered into collective bargaining contracts with their labor union which provided that they would be paid wages and pension benefits comparable to those received by Transit Authority employees. However, Varsity contends that contrary to its prior representations, the board, in early 1979, circulated contract proposals which did not contain requirements that the successful bidder (1) give preference in hiring to those presently employed, (2) pay prevailing wages, and (3) continue the existing pension and welfare benefits. According to Varsity, because of such prior representations of the board, and its reliance thereon, Varsity is required by contractual agreement with its employees' union to pay such prevailing wage and continue the existing pension plan. Further, with respect to the pension plan, Varsity alleges that if the successful bidder does not continue the policy of job security and the existing pension plan, it (Varsity) may, under Federal law, be liable to the pension fund as the result of underfunding of the plan, by some $13,000,000. Such changes in the board's contract proposals, charges Varsity, violate the representations previously made to Varsity by the board and were prepared, *inter alia,* to lower the wages and the benefits paid to employees and to destroy the ability of Varsity to bid on the contract proposals. From the papers submitted by all parties involved or interested in this litigation, it may be inferred that the board, by inserting provisions in contract proposals requiring seniority in hiring, parity in wages and fringe benefits, was seeking labor peace. It may also be logically deduced from the same papers that the board knew, or should have known, that in order to secure the labor peace that it was seeking, a successful bidder would have to incur serious financial obligations which would survive and transcend the bus transportation contract. That the board was extremely desirous of having the successful bidder furnish such long-term labor tranquility for it, is perhaps evidenced from the preamble inserted by it in contract proposals between 1965 and 1977 with respect to the wage parity clause, to wit, that the board was *"concerned with the safety and reliability of service for the transportation of children, and with the continuity of employment of experienced personnel"* (emphasis supplied). Of some significance on this issue is the fact that the board has taken the position that it is a third-party beneficiary of the "no strike" provisions of Varsity's labor contract with the union. Similarly, it may also be logically inferred that the board was cognizant that in order for a successful bidder to comply with the pension and welfare provisions of the contract proposals, the funding of any pension plan would of necessity encompass a much greater length of time than the transportation contracts from which the plan was spawned. Actuarial calculations for the amount of such finding are purportedly based upon normal life expectancies and the normal rate of turnover of employees, as well as the normal length of employment. It is not unreasonable to assume that such calculations are projected over a span of time greater than 13 years. Thus, underfunding causing personal liability to Varsity in the amount of millions of dollars from changes in the contract proposals is a serious matter especially if the board by its actions over the years induced Varsity to place itself in such a vulnerable position. That the board knew or should have known that a successful bidder would be obligated over a great number of years under a pension system mandated by the board in prior contract proposals, may be inferred from the fact that the board itself is undoubtedly involved in the funding of long-term pension systems for many of its employees. Municipal corporations may be, and frequently have been, held

subject to the doctrine of estoppel under special circumstances. Accordingly, municipalities have been estopped by their acts and conduct where they are acting within their powers and in a proprietary or private capacity, or where right and justice and principles of common honesty require that the doctrine be applied to municipalities, in matters not wholly *ultra vires,* the same as it is to individuals, as where the party invoking the doctrine has expended large sums of money, or has parted with value or incurred a new liability in reliance upon the acts or conduct of the municipality or its officers and agents; or where the nonapplication of the doctrine will encourage or permit a fraud, as where, the act or contract being *intra vires* and not prohibited by law, the municipality has accepted benefits thereunder. While a municipality is not estopped from denying the validity of a contract wholly beyond its powers, it may be estopped by the exercise of contractual powers legally vested in it, and, according to a number of cases, even in the exercise of governmental functions, it may be estopped where justice, right, and the equities of the situation demand it, although the rule in some jurisdictions is that the municipal corporation must receive some benefit from the transaction in order to be estopped (28 Am Jur 2d, Estoppel and Waiver, § 128, p 792; see, also, Ann., 1 ALR2d 338, § 8). Thus, whether the labor provisions imposed on Varsity by the board when it entered into the transportation contract in 1965 and thereafter, up to and including 1977, constituted the functional equivalent of a statement of policy and planned course of conduct, on which Varsity was induced to rely, and, in reliance thereon, it entered into collective bargaining agreements with the union, are questions which should be resolved at a trial. We also believe that Varsity states a valid cause of action with respect to the board's alleged actions in advising competitors of Varsity that they would not be required to provide dual-door buses for handicapped children if successful bidders under any new contract, notwithstanding that such facilities are mandated under a provision of the New York City Administrative Code, enacted in 1971 (§ Z51-2.3). In its complaint Varsity asserts that it purchased 371 dual-door vehicles at a cost in excess of $5,000,000. Varsity's attorney, in an affidavit supporting this and the other causes of action, contends, *inter alia,* that at the 1979 prebid conferences, the board's director of pupil transportation informed all prospective bidders that the board would attempt to repeal the ordinance requiring dual-door buses for handicapped children, and would therefore accept bids from bidders using equipment which did not comply with the ordinance on condition that the successful bidder "show evidence of an intention to acquire such equipment 'in the future'." In view of such alleged facts, it is conceivable that Varsity has been placed in the position of bidding against those who have not made an investment in dual-door buses and believe they do not need to, at least initially, based on the possibility that either the subject ordinance will be repealed, or that they would have an indefinite period of time in which to comply with the law after being selected as successful low bidder. The fact that the order from which this appeal is taken directs the board to refrain from advising prospective bidders that the afore-mentioned provision of the Administrative Code may be ignored, might not have had any effect on bidders who have been purportedly advised that bids will be accepted which do not contemplate the use of dual-door buses for handicapped pupils. Moreover, the order of Special Term does not grant the relief which is sought under this cause of action, namely, to enjoin the solicitation and acceptance of bids for the transportation of handicapped pupils which do not contemplate the use of dual-door buses. Thus, in our opinion an issue has been presented in the

dual-door bus controversy as to whether the board has illegally designed bidding specifications in order to shut out competitive bidding by Varsity or favor some of its competitors (cf. *Edenwald Contr. Co. v City of New York,* 86 Misc 2d 711, affd 47 AD2d 610; *Matter of McNutt Co. v Eckert,* 257 NY 100). It is obvious that Varsity in submitting bids on contracts to transport handicapped children, must take into account the substantial cost it has already incurred in obtaining dual-door buses. It is not evident from this record that its competitors either have taken, or realize that they will have to take, such cost factors into account for the same facilities in their bids. Thus since we believe the two claims discussed above state valid causes of action, the motion by the board to dismiss the entire complaint as such pleading pertains to it, should be denied (cf. *Edwards v Codd,* 59 AD2d 148; *Matter of Freidus v Guggenheimer,* 57 AD2d 760). [98 Misc 2d 255.]