In the Matter of ERIE COUNTY INDUSTRIAL DEVELOPMENT AGENCY et al., Respondents, v LILLIAN ROBERTS, Individually and as Commissioner of Labor, Appellant, and BUILDING & CONSTRUCTION TRADES COUNCIL OF BUFFALO, NEW YORK & VICINITY, AFL-CIO, Intervenor-Respondent-Appellant.

Fourth Department, July 11, 1983

APPEARANCES OF COUNSEL

*Robert Abrams,* Attorney-General (*Peter B. Sullivan* of counsel), for appellant.

*Magavern, Magavern, Lowe, Beilewech, Dopkins & Fadale* (*James L. Magavern, Susan C. Goldberg, Marianne E. Hanley* and *Francis W. Gruene* of counsel), for Erie County Industrial Development Agency, respondent.

*Lipsitz, Green, Fahringer, Roll, Schuller & James* (*Frank S. Kedzielawa* and *Richard Lipsitz* of counsel), for intervenor-respondent-appellant.

*Bryant, O'Dell & Basso* (*Robert H. Basso* of counsel), for Empire State Chapter of Associated Builders and Contractors, Inc., *amicus curiae.*

*Colleran, O'Hara, Kennedy & Mills, P. C. (Richard L. O'Hara, Robert A. Kennedy* and *Victoria Quesada* of counsel), for New York State Building & Construction Trades Council, *amicus curiae.*

OPINION OF THE COURT

SCHNEPP, J.

In this CPLR article 78 proceeding, which also seeks declaratory relief, we are asked to determine whether the prevailing wage requirement of section 220 of the Labor Law is applicable to private construction projects which are financed by industrial development agencies through the issuance of tax exempt industrial development revenue bonds. Special Term rejected the determination of the Commissioner of Labor that the prevailing wage requirement applies and prohibited the commissioner from taking any further action to apply the requirement either to the petitioner Quo Vadis Editions, Inc., or a typical industrial development bond project of the petitioner Erie County Industrial Development Agency. We agree with Special Term that such projects are not "public works" within the meaning of section 220 of the Labor Law.

The New York State Legislature enacted the New York State Industrial Development Agency Act in 1969 (General Municipal Law, art 18-A [as added by L 1969, ch 1030]) with the expressed purpose to attract commercial and industrial development. The act declares it to be the policy of this State "to promote the economic welfare * * * and prosperity of its inhabitants and to actively promote, attract, encourage and develop * * * economically sound commerce and industry * * * through governmental action for the purpose of preventing unemployment and economic deterioration by the creation of industrial development agencies". (General Municipal Law, § 852; see, also, General Municipal Law, § 858.) It authorizes the organization of industrial development agencies and directs that each "shall be a corporate governmental agency, constituting a public benefit corporation" (General Municipal Law, § 856, subd 2). A function of the agency is to make private financing available to private developers at tax exempt interest rates through the sale of industrial development revenue bonds. The Erie County Industrial Development

Agency was created in 1970 to accomplish the purposes of the act for the benefit of the County of Erie and its inhabitants. (General Municipal Law, § 891, as added by L 1970, ch 293, renum § 891-a by L 1977, ch 834.)

In a typically financed project, a private business company seeking industrial development revenue bond (IDB) financing makes all the necessary preliminary decisions concerning land acquisition, construction and budgeting of the project and submits an application to the agency for approval. Upon receiving approval the company negotiates the economic terms of the financing with a private lender, usually a bank, willing to purchase an IDB from the agency. Once a commitment is agreed to by the bank and the company, a formal commitment letter is delivered to the bond counsel for the agency who translates the terms of the commitment letter into a bond purchase agreement[1] between the agency and the lending bank and certain other IDB documents to which the company, the bank and the agency are parties. The documents which provide for the flow of loan and repayment funds between the bank and the company and for the security for the loan are as follows: (1) a deed from the company to the agency, which vests formal legal title to the project in the agency, and a lease[2] back to the company which requires the company to pay rent equivalent to the principal and interest due on the IDB; (2) a mortgage on the property to secure the loan and an assignment to the bank of the agency's rights under the lease; and, (3) an IDB with tax exempt status issued by the agency to the bank which is payable only from the rents

1. The bond purchase agreement provides, *inter alia,* for the issuance of the bond by the agency to the bank to finance the project. The agreement describes the terms of the bond, and provides that the bank is acquiring the bond for its own account, that executed copies of the contract documents will be delivered at closing, that the bond constitutes a special obligation of the agency payable solely from the lease rentals, revenues and receipts derived from or in connection with the project and that the bond does not constitute a debt of the State of New York or the municipality.

2. The lease provides, *inter alia,* that the agency will, subject to the covenant of the company to complete the acquisition, construction and installation of the project, "cause to be constructed on said property * * * the buildings, structures and related facilities thereon." It also provides that the company agrees to complete the construction "on behalf of the agency under the supervision of an independent engineer."

paid under the lease. All the documents are part of a single, integrated transaction with delivery of each document dependent upon delivery of each of the others. When the financing transaction is closed, the bank does not pay the agency for the IDB but instead holds the loan funds in a project fund which it controls as trustee. Disbursements from the fund are made to finance, in part, the construction of the project and are paid by the bank directly to the company as the project is built. Rents under the lease are paid by the company to a bond fund held by the bank which is used to pay the interest and amortize the principal amount of the IDB. When the IDB is paid in full, the agency returns to the company the title to the project.

Interest received by the bank on the IDB is exempt from Federal income tax (Internal Revenue Code of 1954 [US Code, tit 26, § 103, subd (b)]) and from New York State income tax (General Municipal Law, § 874), allowing these bonds to be marketed well below prevailing interest rates. Projects financed by an IDB are also exempt from State and local sales taxes (General Municipal Law, § 874) and from local property taxes so long as the agency holds title (Real Property Tax Law, § 412-a). Thus, the real purpose of this complex financial arrangement is to provide the company developing the project with tax relief and to insure the tax exempt status of the bonds which are used to finance the construction of the project.

In March, 1981 the Erie County Industrial Development Agency authorized the issuance of an $825,000 IDB for a part of the cost of the construction of a new printing and binding plant in the Town of Hamburg, Erie County, by Quo Vadis Editions, Inc., a subsidiary of the French corporation Quo Vadis, S. A., which is incorporated under Delaware law and is qualified to do business in New York State. Upon negotiating the terms of the financing and receiving a commitment by Manufacturers and Traders Trust Company to purchase the IDB from the Erie County Industrial Development Agency, Quo Vadis purchased land in the Ravenwood Industrial Park, Hamburg, New York, for the building site and, under the date of May 24, 1982, entered

into a construction contract[3] in the amount of $1,271,439. Quo Vadis, the bank and the agency then consummated the typical IDB financing agreement on June 30, 1982 and construction of the plant started soon thereafter. On September 2, 1982 the commissioner advised the agency, as well as the other industrial development agencies in the State, of her determination that construction projects financed with IDBs are subject, *inter alia,* to the prevailing wage requirement of section 220 of the Labor Law, and, under date of October 12, 1982, notified Quo Vadis that it was in violation of the Labor Law for failure to comply with the requirements of the section. This proceeding was then brought by petitioners which sought a determination that the Quo Vadis project and other typically financed construction projects by the Erie County Industrial Development Agency are not subject to the prevailing wage requirement of section 220 and to prohibit the commissioner from applying the requirement to these projects.

The prevailing wage requirement embodied in section 220 is a legislative enactment which has as its genesis the 1905 amendment of section 1 of article XII of the State Constitution of 1894.[4] Section 220 is part of article 8 of the Labor Law which is entitled "Public Work". Subdivision 2 of section 220 provides that "[e]ach contract to which the state or a public benefit corporation or a municipal corporation or a commission appointed pursuant to law is a party and which may involve the employment of laborers, workmen or mechanics shall contain a stipulation that no laborer, workman or mechanic * * * shall be permitted or required to work more than eight hours in any one calendar day or more than five days in any one week". Subdivi-

---

**3.** The construction contract is the "Standard Form of Agreement between Owner and Contractor", signed only by Quo Vadis designated as "Owner" and Harvey Meyers & Sons, Inc., as "Contractor", and is governed by the general conditions of the contract for construction, a generally accepted construction contract of the American Institute of Architects.

**4.** In its present form, section 17 of article I of the State Constitution provides that "[n]o laborer, workman or mechanic, in the employ of a contractor or subcontractor engaged in the performance of any public work, shall be permitted to work more than eight hours in any day or more than five days in any week, except in cases of extraordinary emergency; nor shall he be paid less than the rate of wages prevailing in the same trade or occupation in the locality within the State where such public work is to be situated, erected or used."

sion 3 of that section requires that: "[t]he wages to be paid for a legal day's work, as hereinbefore defined, to laborers, workmen or mechanics upon *such public works,* shall be not less than the prevailing rate of wages as hereinafter defined." (Emphasis added.) The term "public works" is not defined in the statute and appears only in subdivision 3. The sole issue on this appeal is whether this statute encompasses construction contracts on projects financed by industrial development agencies such as the Quo Vadis manufacturing plant.

Appellants urge that the phrase "such public works" refers to any contract to which a public benefit corporation is a party "and which may involve the employment of laborers" and that any such contract is subject to the provisions of section 220. They contend that the Quo Vadis project became subject to the prevailing wage requirement by virtue of the provisions of the lease agreement herein which allow for and govern the construction of the project, and because the construction phase of this project furthers a public purpose by employing workers. Such an interpretation of section 220 is without merit.

A full reading of the statute makes clear that the word "contract" used in subdivision 2 means a "public works" contract, since the prevailing wage rates must be applied to labor engaged "upon such public works", and not just any contract by a public agency involving the employment of labor. The subdivisions, when read together and in conjunction with the statutory scheme of article 8 of the Labor Law, indicate the existence of two conditions which must be met before the statute applies: (1) the public agency must be a party to a contract involving the employment of laborers, workmen, or mechanics, and (2) the contract must concern a public works project (see McKinney's Cons Laws of NY, Book 1, Statutes, § 97).

Our courts have consistently limited the application of section 220. "It is hornbook law that the Labor Law provision applies only to workers involved in the construction, replacement, maintenance and repair of 'public works' in a legally restricted sense of that term" (*Varsity Tr. v Saporita,* 71 AD2d 643, 644; see, also, *Matter of Golden v Joseph,* 307 NY 62, 66). In *Varsity* it was held that city school bus

drivers and matrons were not within the class of employees covered by the law. Likewise, *Matter of Pinkwater v Joseph* (275 App Div 757, affd 300 NY 729) held that laundry workers in a city institution did not have to be paid the prevailing rate of wages. Although each of these cases involved labor contracts to which a municipal corporation was a party, section 220 was held not applicable because the nature of the work performed did not involve the construction, maintenance and repair of a public works. Thus, the mere fact that the agency here is a party to a contract which may involve the employment of laborers is not dispositive of this case. We must consider whether the project under construction is a public works.

Although section 220 does not define the term "public works", the term has a generally accepted plain meaning which should be given effect (see McKinney's Cons Laws of NY, Book 1, Statutes, § 94, pp 191-194). "In the absence of such statutory definition, the meaning ascribed to [the] * * * phrase by the lexicographers may serve as a useful guidepost." (*Quotron Systems v Gallman,* 39 NY2d 428, 431.) Webster's New World Dictionary, for example, defines "public works" as a "fixed works (as schools, highways, docks) constructed for public use or enjoyment esp. when financed or owned by the government". Black's Law Dictionary (5th ed, p 1440) describes a "public works" as "fixed works constructed for public use". These definitions focus on the purpose or function of the works for "public use or enjoyment".

Likewise, in determining the applicability of section 220 the courts have focused on the purpose or function of the project. In *Matter of Miele v Joseph* (280 App Div 408, affd 305 NY 667), for example, it was held that letter and sign painters employed by the City of New York are engaged in public work when they paint or letter signs and other information on public structures. The court said that: "[t]he test to be applied in determining what is public work is rather function than magnitude. It is not easy to conceive an instrument of public use better adapted functionally than a public sign." (*Matter of Miele v Joseph, supra,* p 409.) A similar approach was used by the court in *Matter of Long Is. Light. Co. v Industrial Comr. of N.Y. State* (40

AD2d 1003, app dsmd 32 NY2d 646, affd 34 NY2d 725). In that case the court held that private construction of municipal street light standards was a public work. The project was authorized by the town and had as its object the public function of providing illumination for the town. The court placed great emphasis on the fact that the town had an option at any time to repurchase the lights and was required by contract to reimburse the company holding title, in the event that use of the standards was discontinued. The court said that "[t]he combined force of these provisions attenuate any claim that the purpose of the contracts was only lighting service rather than the erection of a public structure." (*Matter of Long Is. Light. Co. v Industrial Comr. of N. Y. State, supra,* p 1004.)

Under this analysis the typically financed IDB project, such as the Quo Vadis construction project, cannot be considered a public works project. The private developer involved here initiated the project and retains the risks and benefits associated with ownership. The project's objective is the establishment of a private manufacturing plant which will produce private goods for sale in the marketplace. The plant will function as a private production facility operated by a private corporation for the sole benefit of its shareholders and will not be for public use. Its construction is being financed, in part, by private money borrowed by a private corporation on its own behalf on the basis of its own credit and the security of its own property. This corporation negotiated the economic terms of the loan and reserves complete control over the project subject only to the security interest required by virtue of the financing arrangement. No public funds are involved and no costs will be reimbursed by the government (see *Matter of Long Is. Light. Co. v Industrial Comr. of N. Y. State, supra*). Although the agency performs a governmental function and operates as a governmental agency and instrumentality, its involvement is limited to providing tax exempt bonds as an investment incentive to the private investors who finance the project. The conveyance of legal title to the agency with the simultaneous lease back to the company is structured merely as a mechanism to facilitate financing and is not a genuine allocation of ownership in the agency.

The economic benefits and burdens of ownership are reserved to the company and the agency serves only as a conduit for the tax benefits provided by such an arrangement. The agency has no formal interest in the venture; it has expended no public funds, either by grant or loan; it has made no guarantees; and it has not extended or committed the State's credit. The bond which it issued is not an obligation of the State, either directly or indirectly (General Municipal Law, § 870). The agency's role is strictly that of an intermediary to insure that private parties qualify for tax exemptions; it assumes no risk of loss and has no opportunity to gain.

Since the function of the Quo Vadis plant is private and the economic attributes of ownership are vested in Quo Vadis, and not the agency, the Quo Vadis project is not a public works. Neither the fact that the agency holds formal title to the project, nor the fact that certain tax exemptions are accorded to the project, transform that which is, in essence, a private venture into something that may be deemed public. Any tax benefits afforded the private lenders for the project do not translate into subsidies, and thereupon into public funds. Nor can foregone tax revenues convert the project into a public works. The public purpose of the financing scheme must not be confused with the purely private purpose of the venture itself, its structure and its operation. The public involvement concerns only the creation of the economic conditions and incentives which will encourage and foster this type of private development. The promotion of economic development is an incidental benefit which is distinct from the primary objective and function of this project as a private business. This same analysis applies to other typical IDB projects of the Erie County Industrial Development Agency. While we recognize that section 220 of the Labor Law should be liberally construed to carry out its beneficent purpose of protecting workers from receiving inadequate wages from a public employer (*Bucci v Village of Port Chester*, 22 NY2d 195, 201), without evidence that the Legislature intended to impose a wage requirement upon IDB financed private construction projects, such intention should not be read

into the statute (see *Patrolmen's Benevolent Assn. of City of N. Y. v City of New York,* 41 NY2d 205, 208-209).

Finally, we note that the commissioner is charged with the responsibility for the administration of section 220 and that the construction given statutes by an agency so charged, if not irrational or unreasonable, should be upheld (see *Matter of Fineway Supermarkets v State Liq. Auth.,* 48 NY2d 464, 468). The question here, however, is one of statutory reading and analysis and there is no need to rely on the expertise of the commissioner. Under the circumstances, deference to her determination is not required (see *Kurcsics v Merchants Mut. Ins. Co.,* 49 NY2d 451, 459).

Accordingly, the order and judgment of Special Term should be affirmed.

HANCOCK, JR., J. P., CALLAHAN, BOOMER and GREEN, JJ., concur.

Order and judgment unanimously affirmed, without costs.