OPINION OF THE COURT
Andrew V. Siracuse, J.
In this action plaintiff Postler & Jaeckle Corp., a construction firm, seeks payment for labor, services, and materials that it supplied on behalf of Photech Acquisition Corporation *393 (Photech)[1] for a project financed through the defendant County of Monroe Industrial Development Agency (COMIDA). Plaintiff’s complaint sets forth five causes of action based on: (1) agency; (2) account stated; (3) refusal to accept specifically ordered material; (4) negligence; and (5) unjust enrichment. The matter is before the court for decision on plaintiff’s motion for summary judgment and defendant’s cross motion for summary judgment. Both parties agree that there are no issues of fact and that the determination is solely one of law. In order to address the validity of plaintiff’s claims, there must first be an understanding of the relationship between Photech and COMIDA, the nature of the project and its financing, and the relative rights and obligations of Photech and COMIDA therein.
Defendant COMIDA is a public benefit corporation created pursuant to article 18-A of the General Municipal Law (L 1969, ch 1030) by section 916 of the General Municipal Law (L 1972, ch 55). In very general terms, the purpose of an industrial development agency (IDA) is to promote, encourage and develop the recreation, economic, commercial and industrial climate in the State and to prevent unemployment and economic deterioration. As such, an IDA is a governmental agency and instrumentality and has certain statutorily created rights and powers (see, General Municipal Law §§ 852, 858, 874).
The Internal Revenue Code of the United States (26 USC) and the General Municipal Law of New York State make certain obligations of IDA’s tax exempt. Due to this tax exemption, a lender does not have to pay income tax on its interest income and, therefore, can loan money at a reduced interest rate. State law also exempts ID As from mortgage recording tax, sales tax, and certain real property taxes, if certain procedures are followed. These various tax exemptions are the tools used to encourage economic development and expansion.
A typical IDA financing is a "conduit” financing achieved through a "bond and mortgage” and "sale and leaseback” transaction. The agency sells its bonds to a bond purchaser. With the funds that are the proceeds of that sale, the agency acquires and takes title to a facility. To secure the bonds, the *394 agency mortgages the acquired facility; thus, the "bond and mortgage” transaction. The agency leases the facility to the entity benefited by the financing and agrees to reconvey the facility for $1 upon termination of the financing; thus, the "sale and leaseback” transaction. The revenue stream under the lease is the amount necessary to amortize the bond and is assigned by the agency to the bondholder.
The bond issued by the agency is a "special obligation bond.” That is, no full faith and credit of either the agency, the county, the State, or any other governmental agency secures payment of the bond. The credit which stands behind the bond is the guaranty of the entity financed or some other credit enhancement, such as a letter of credit, which is based upon the credit of the entity financed. The agency’s liability is limited by this "special obligation.”
The transaction herein followed this typical scenario. In February 1989, Photech applied to COMIDA for financial assistance. Photech was engaged in the manufacture and distribution of photographic films and papers for the graphic arts industry. The City of Rochester Economic Development Administration and COMIDA sought to retain Photech as a viable economic entity and to protect the over 60 jobs that its presence in the community represented. After a public hearing, COMIDA adopted a resolution to take official action toward issuance of bonds. Arrangements for the placement of bonds with Massachusetts Financial Services were made through First American Municipals, Inc. and First Albany Corporation.
On June 26, 1989, $9,300,000 in bonds were issued, sold and delivered. COMIDA acquired title to the facility at 1000 Driving Park Avenue in Rochester and leased the facility back to Photech pursuant to a lease agreement dated as of June 1, 1989. COMIDA, in turn, gave a bond and mortgage to the bond institution. The revenue stream under the lease was set at an amount necessary to amortize the bond and was assigned by COMIDA to the bondholder. COMIDA’s liability was limited by the "special obligation”, i.e., the amount of the bond proceeds. (Lease § 4.5.)[2] In addition to the bond financing, *395 the City of Rochester also loaned to Photech $280,000. Photech defaulted on its various financings which led to the commencement of a foreclosure proceeding by First National Bank of Boston as trustee of the bond issue and gave rise to this action.
Postler & Jaeckle was hired by Photech between August 15, 1989 and January 1, 1990 to provide materials and services and to perform labor on the facility. When Postler & Jaeckle’s invoices to Photech were unpaid, it sued Photech and obtained a judgment. Realizing that the judgment was not collectible, plaintiff then commenced this action against COMIDA. It is plaintiffs contention that it agreed to work on the project, despite previous payment problems with Photech’s predecessor in interest, because COMIDA was involved.
In support of its agency theory, plaintiff relies upon sections 1.07 and 3.01 of the inducement agreement dated February 16, 1989[3] and section 4.1 (e) of the lease agreement dated July 1, 1989[4] whereby COMIDA explicitly appointed Photech its agent for purposes of rehabilitating and equipping the facility and Photech accepted the appointment. While, when read in isolation, these provisions appear to lend credence to plain *396 tiff’s position, these documents, when read in their entirety and together, indicate that no authority was granted to Photech by COMIDA to bind the latter for financial obligations which the former was not prepared to meet using the bond proceeds or its own funds. Even if an agency were created by which Photech had the authority to bind COMIDA on contracts which Photech entered, Photech exceeded the scope of its authority by incurring obligations for which payment could not be or was not made from the bond proceeds or Photech’s funds.
Any agency created by the aforementioned language was specifically limited by other provisions also contained in the inducement agreement and lease. Section 3.05 of the inducement agreement provides for the defense and indemnification of COMIDA by Photech and limits Photech’s agency authority.[5] The lease agreement at section 4.5 requires Photech to complete the facility with its own funds if the bond proceeds are not sufficient to accomplish this (see, n 2, supra). This is a clear indication that COMIDA did not take on responsibility beyond the amount of the bond proceeds.
The provisions of section 8.2 of the lease[6] contain language by which Photech released COMIDA from any liability and *397 agreed to defend, indemnify and hold harmless the agency regarding any transactions engaged in by Photech as COMIDA’s agent. Section 6.4 (c) of the lease[7] requires Photech to provide insurance for the benefit of COMIDA to ensure this indemnification.
Beyond the limiting language contained in these documents, the structure of the transaction as a whole indicates that there was no intention to create in Photech the ability to bind COMIDA for any obligations undertaken by Photech beyond the amount of the bond proceeds. The Appellate Division, Fourth Department, has recognized that the transaction, its nature and purpose, must be viewed as a whole; "All the documents are part of a single, integrated transaction with delivery of each document dependent upon delivery of each of the others. When the financing transaction is closed, the bank does not pay the agency for the IDB [industrial development bond] but instead holds the loan funds in a project fund which it controls as trustee. Disbursements from the fund are made to finance, in part, the construction of the project and are paid by the bank directly to the company as the project is built. Rents under the lease are paid by the company to a bond fund held by the bank which is used to pay the rent and amortize the principal amount of the IDB. When the IDB is paid in full, the agency returns to the company the title to the project.” (Matter of Erie County Indus. Dev. Agency v Roberts, 94 AD2d 532, 535 [4th Dept 1983].)
It has also been noted that "the IDA is not the intended, beneficiary; it is only a conduit. The ultimate beneficiary is the people of New York who benefit by the fostering and growth of business, a goal which would be hindered and made economically burdensome by the imposition of sales taxes upon the occupant for whom the benefits of the legislatively created funding agencies were directly intended.” (Wegmans Food Mkts. v Department of Taxation & Fin., 126 Misc 2d 144, 152-153 [1984].)
It is clear that the defendant was not the beneficiary of the financing transaction or of the contract entered into by plaintiff and Photech. Any agency that was created was done so for the sole benefit of Photech and ultimately the people of the *398 State of New York for the purpose of exempting the project from sales tax.
An agent is "a person authorized by another to act on his account * * * who acts for or in the place of another by authority from him. He is one who, by the authority of another, undertakes to transact some business or manage some affairs on account of such other.” His primary function is "to bring about business relations between the principal and third persons.” (2 NY Jur 2d, Agency, § 1, at 471.) Inherent in the definition of an agent is that he is conducting business on behalf of the principal. Given the background, and structure of the industrial development agency and the lack of any actual interest by COMIDA in the facility, it is clear that Photech acted on its own behalf and not on behalf of or in furtherance of COMIDA’s business. COMIDA was not benefited by the agreement between plaintiff and Photech and, therefore, was not bound by any contract entered between Photech and plaintiff.
Plaintiff’s own proof indicates that the transaction was not entered with the intention to make COMIDA liable for payment or in the belief that COMIDA was Photech’s principal. Photech, in dealing with Postler & Jaeckle, acted in its own right rather than as agent for COMIDA. Plaintiff’s invoices were issued to Photech directly with no mention of COMIDA or of Photech as agent of COMIDA. The sales tax information packet given to Photech as part of its financing describes the procedures which must be followed by an agent of COMIDA to qualify for the sales tax exemption. These procedures were not followed. Sales tax was charged, which, if Photech had been acting as agent for COMIDA, would not have been incurred. That plaintiff never really believed that COMIDA was liable on the contract is also evidenced by the fact that plaintiff took judgment against Photech and commenced this action only after that judgment proved to be uncollectible.
Any agency created by COMIDA in Photech did not authorize the latter to bind the former for obligations undertaken by Photech. Further, if such an agency had been created, it would have been limited pursuant to the inducement agreement and lease to the amount of the bond proceeds.
Plaintiff’s action for an account stated cannot stand because, as noted previously, Postler & Jaeckle never billed COMIDA either directly or through Photech as agent. For an account stated action, there must be a debtor and creditor relationship *399 between the parties as to the items forming the account. (Bauer v Ambs, 144 App Div 274, 275 [2d Dept 1911].) Plaintiff has failed to produce any documentation to support this theory.
Similarly, with regard to the third cause of action, plaintiff never demanded that COMIDA take delivery of any special items and there is no evidence that COMIDA ever authorized Photech to incur liability on COMIDA’s behalf beyond the amount of the bond proceeds.
The negligence cause of action must be dismissed because plaintiff failed to serve a notice of claim as required by General Municipal Law §§ 880 and 50-e.
Finally, plaintiff’s unjust enrichment theory is without merit because, as previously discussed herein, COMIDA was not a beneficiary of the project. Under section 8.8 of the lease, the beneficial incidents of ownership belong to Photech. COMIDA assumed no risk of loss or opportunity for gain. All of the rights and obligations of ownership resided with Photech except for bare legal title which was held by COMIDA solely for the purpose of allowing Photech to obtain tax benefits and exemptions.
Based on the foregoing, plaintiff’s motion for summary judgment is denied and defendant’s cross motion for summary judgment is granted.

. Photech Acquisition Corp. is a corporation formed in 1989 to acquire substantially all assets and to assume certain liabilities of Photech Imaging Systems, Inc.

. Section 4.5 states, in relevant part: "(a) In the event that the Net Proceeds of the Bonds are not sufficient to pay in full all initial Costs of the Facility in accordance with the Plans and Specifications, the Company agrees, for the benefit of the Issuer, to pay all such sums as may be in excess of the Net Proceeds of the Bonds to complete acquisition of the *395 Facility * * * (b) The Company shall not be entitled to any reimbursement for such excess expense from the Issuer or the Trustee or the Owners of the Bonds”.

. Section 107 of the inducement agreement states: "In the Resolution, the Issuer appointed the Company its agent for the purposes of acquiring, rehabilitating and equipping the Facility, entering into contracts and doing all things requisite and proper for completing the Facility.” Inducement agreement § 3.01 provides: "The Company hereby accepts the appointment made by the Issuer in the Resolution to be the true and lawful agent of the Issuer to (i) acquire, rehabilitate and equip the Facility and, (ii) make, execute, acknowledge, and deliver any contracts, orders, receipts, writings and instructions, as the stated agent of the Issuer, and in general to do all things which may be requisite or proper for completing the Facility, all with the same powers and the same validity as the Issuer could do if acting on its own behalf.”

. In relevant part section 4.1 (e) of the lease provides: "The Issuer hereby appoints the Company its true and lawful agent, and the Company hereby accepts such agency, (i) to acquire, rehabilitate and equip the Facility in accordance with the Plans and Specifications, (ii) to make, execute, acknowledge and deliver any contracts, orders, receipts, writings and instructions with any other Persons, and in general to do all things which may be requisite or proper, all for renovating the Project and acquiring and installing the Equipment with the same powers and with the same validity as the Issuer could do if acting in its own behalf, (iii) to pay all fees, costs and expenses incurred in the rehabilitation of the Project and the acquisition and installation of the Equipment from funds made available therefor in accordance with this Lease Agreement”.

. Section 3.05 of the inducement agreement, in relevant part, states: "(a) The Company shall not permit to stand, and will, at its own expense, take all steps reasonably necessary to remove * * * any mechanics’ or other liens against the Facility for labor or materials furnished in connection with the acquisition, rehabilitation and equipping of the Facility. The Company shall forever defend, indemnify and hold the Issuer, its members, officers, employees and agents, and anyone for whose acts or omissions the Issuer or any of them may be liable, harmless from and against all costs, losses, expenses, claims, damages and liabilities of whatever kind or nature arising, directly or indirectly, out of or based on labor, services, materials and supplies, including equipment, ordered or used in connection with the acquisition, rehabilitation and equipping of the Facility or arising out of any contract or other arrangement therefor (and including any expenses incurred by the Issuer in defending any claims, suits or actions which may arise as a result of any of the foregoing), whether such claims or liabilities arise as a result of the Company acting as agent for the Issuer pursuant to this Agreement or otherwise.”

. Lease agreement §8.2 provides, in relevant part: "Hold Harmless Provisions, (a) The Company hereby releases the Issuer from, agrees that the Issuer shall not be liable for and agrees to defend, indemnify and hold the Issuer harmless from and against any and all * * * (ii) liability arising from or expenses incurred by the Issuer’s financing, acquisition, rehabilitation and equipping, owning and leasing of the Facility, including, without limiting the generality of the foregoing, all claims arising from (x) the exercise by the Company of the authority conferred upon it pursuant to Section 4.1 (e) of this Lease Agreement”.

. In relevant part, section 6.4 (c) of the lease requires that Protech provide: "Insurance protecting the Company, the Trustee and the Issuer against loss or losses from liabilities imposed by law or assumed in any written contract (including the contractual liability assumed by the Company under Section 8.2 hereof)”.