WESTERN ALASKA BUILDING & CON-
STRUCTION TRADES COUNCIL, Jerry
Smart, Larry Libbey, Richard Guittier-
ez, Willie Sallison, and Linda Machia,
and State of Alaska, Department of La-
bor, Appellants,

v.

INN–VESTMENT ASSOCIATES OF
ALASKA and A & A Construction
and Development, Inc., Appellees.

Nos. S–5887, S–5968.

Supreme Court of Alaska.

Jan. 12, 1996.

Rehearing Denied Feb. 15, 1996.

James A. Gasper and William K. Jermain,
Jermain, Dunnagan & Owens, Anchorage, for
Appellants Western Alaska Building & Con-
struction Trades Council, Jerry Smart, Larry
Libbey, Richard Guittierez, Willie Sallison
and Linda Machia.

Robert A. Royce, Assistant Attorney Gen-
eral, Anchorage, and Bruce M. Botelho, At-
torney General, Juneau, for Appellant State
of Alaska, Department of Labor.

Robert K. Stewart, Jr., Davis Wright Tre-
maine, Anchorage, for Appellees Inn–Vest-
ment Associates of Alaska and A & A Con-
struction and Development, Inc.

Before: MOORE, C.J., and
RABINOWITZ, MATTHEWS, COMPTON
and EASTAUGH, JJ.

*OPINION*

COMPTON, Justice.

I. *INTRODUCTION*

The Alaska Railroad Corporation (ARRC)
entered into a general partnership with pri-

vate investors, Inn–Vestment Associates of Alaska (IAA). The purpose of IAA was to finance, construct, and maintain the Comfort Inn (Inn) on ARRC land in the Ship Creek area of Anchorage. IAA contracted with A & A Construction and Development, Inc. (A & A) for construction of the Inn.

The primary question presented in this case is whether ARRC's involvement in IAA implicated the provisions of Alaska's Little Davis–Bacon Act, AS 36.05, which requires that workers on public construction projects receive at least the current prevailing wage. AS 36.05.010. Both the Alaska Department of Labor (DOL) and the State Attorney General indicated that the project was subject to Alaska's Little Davis–Bacon Act, and thus workers should be compensated in accordance with the statutorily mandated prevailing wage. In response, IAA and A & A sought declaratory relief in the superior court, asking that the project be deemed outside the purview of the statute. IAA, A & A, and the State each moved for summary judgment. After permitting the Western Alaska Building and Trades Council (Trades Council) to intervene, the superior court entered summary judgment in favor of IAA and A & A.[1] DOL and Trades Council appeal. We reverse.

## II. FACTS AND PROCEEDINGS

In August 1991 ARRC received a 40% equity share in IAA, in exchange for contributing the land upon which to build the Inn. This partnership was formed for the purpose of financing, constructing, and maintaining the Inn. The remaining 60% of the partnership was owned by four groups of husband/wife investors who had previously participated together in other hotel development projects. ARRC is the largest individual shareholder.[2]

Initially ARRC had desired merely to lease its land to the investors and achieve a return based upon the market lease-value of the land. However, the investors urged ARRC to join them, become an equity partner, and execute all IAA loan obligations as a co-obligor. The investors' stated rationale for this arrangement, which they had utilized numerous times before, was to encourage cooperation between the landowner and the other investors. ARRC agreed to the arrangement, believing that it could realize a greater return on its land if it participated in development of the land. By virtue of owning a forty percent partnership interest, ARRC is the only partner whose approval *must* be obtained for significant partnership decisions; such matters require a sixty-one percent majority approval vote.[3] However, day-to-day operational authority is vested in IAA's managing partner and a management company[4] that has been hired to operate the Inn.

ARRC undertook substantial obligations as a result of its partnership interest in IAA. ARRC leased the land, valued at $845,000, to IAA for $1.00 annually for a term of 35 years. A renewal term of an additional 35 years is available at IAA's option. If ARRC divests itself of its partnership interest at any time, the lease reverts to market lease rates. In addition to contributing use of the land, ARRC and the other investors executed as co-borrowers and separate obligors a $3.9 million construction loan agreement. This is an obligation on which ARRC and the other investors are individually 100% liable.

ARRC does not "use, occupy, or directly control any part of the ... Inn project." Instead, in announcing its participation in the project, ARRC enumerated three purposes for its involvement: (1) augmenting its passenger business, (2) creating a source of real estate income and (3) supporting its redevelopment of the Ship Creek area. Additional-

---

1. IAA and A & A filed a single appellees' brief in this court. Therefore, references to the appellees' arguments will be addressed as those of IAA, but represent A & A's also.

2. The four husband/wife investment teams owned 23%, 12%, 18% and 7%, respectively, of IAA.

3. IAA maintains that all partners enjoy the ability to veto fundamental partnership decisions. However, IAA's citation to the record does not confirm this assertion.

4. The husband/wife investor groups that comprise the 60% of IAA not owned by ARRC also own the management company.

ly, ARRC noted that it had a history of investing in hotels, and planned similar future investments since such enterprises benefit and support ARRC's passenger business.

IAA contracted with A & A[5] for construction of the Inn. The total costs of improvements to the land eventually amounted to approximately $3.8 million, including architectural, engineering, and general contractor fees.

In April 1992 the Attorney General issued an opinion, and DOL stated, that the project constituted "public construction" that was subject to the provisions of Alaska's Little Davis–Bacon Act. IAA and A & A responded by seeking declaratory relief in the superior court and a ruling that the Act did not apply to the project.[6] Motions for summary judgment were filed. Before the court ruled on the motions, the Trades Council and several of its individual members were permitted to intervene. The superior court granted IAA and A & A's motion, holding that the Act did not apply. The court, however, provided no corresponding analysis, findings of fact, or conclusions of law. Additionally, the court awarded attorney's fees to IAA and A & A in the amount of fifty percent of their actual fees, stating that the actual fees were reasonable and, that while efforts were "not 'labor intensive' in the sense of extensive discovery, motion practice or trial," the lawyers had conducted extensive analysis of novel and complex issues. DOL and the Trades Council appeal both the superior court's holding and its award of attorney's fees.

## III. DISCUSSION

### A. Standard of Review

■ The issue in this case is whether the work performed in constructing the Inn constituted "public construction" subject to Alaska's Little Davis–Bacon Act's wage protection provisions. AS 36.05.010, 36.95.010. We are reviewing the superior court's summary

judgment holding that the Act does not apply. In *City and Borough of Sitka v. Construction and General Laborers Local 942*, 644 P.2d 227 (Alaska 1982), we addressed the identical issue on appeal from a summary judgment holding. *Id.* at 230. We apply the same standard of review that was appropriate in *Sitka:* "We employ de novo review to the question of law raised by the summary judgment motion." *Id.* at 230 n. 7 (citing *Armco Steel Corp. v. Isaacson Structural Steel Co.*, 611 P.2d 507, 516 n. 22 (Alaska 1980)).

### B. Statutory Provisions

■ The dispute centers on the language of AS 36.05.010 and AS 36.95.010. Alaska Statute 36.05.010 provides:

A contractor or subcontractor who performs work on *public construction* in the state, as defined by AS 36.95.010, shall pay not less than the current prevailing rate of wages for work of a similar nature in the region in which the work is done. The current prevailing rate of wages for each pay period is that contained in the latest determination of prevailing rate of wages issued by the Department of Labor before the end of the pay period.

AS 36.05.010 (emphasis added). It is the phrase "public construction," and whether it encompasses the Inn project, that is the basis for the dispute between the parties. Alaska Statute 36.95.010(3), which provides definitions applicable to AS 36.05.010, supplies some assistance in interpreting the phrase:

"[P]ublic construction" or "public works" means the on-site field surveying, erection, rehabilitation, alteration, extension or repair, including painting or redecorating of buildings, highways, or other improvements to real property under *contract for the state*, a political subdivision of the

---

**5.** A & A is owned by a husband and wife team who are also partners in IAA.

**6.** In their briefs, the parties did not specify, or provide a citation to the record for, the incremental wage costs that IAA would have incurred

if it had complied with the Act. During oral argument, the Trades Council's attorney maintained that in an affidavit that ARRC had submitted to the superior court, the incremental cost of compliance was estimated at $500,000 to $600,000.

state,[7] or a regional school board.

AS 36.95.010 (emphasis added). Because this legislation "is a remedial act for the benefit of construction workers, [it] is therefore liberally construed to effectuate its beneficent purpose." *Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees and Helpers, Local Union No. 695 v. NLRB*, 361 F.2d 547, 553 n. 23 (D.C.Cir.1966).[8]

### C. *Case Law*

This court has interpreted the applicable statutory language in two prior cases: *City and Borough of Sitka v. Construction and General Laborers Local 942*, 644 P.2d 227 (Alaska 1982), and *Alaska State Federation of Labor v. State, Department of Labor*, 713 P.2d 1208 (Alaska 1986).

#### 1. *City and Borough of Sitka v. Construction and General Laborers Local 942*

In *Sitka*, we concluded that a timber harvesting contract, which was a necessary precursor to a dam construction project, fell within the ambit of Alaska's Little Davis–Bacon Act. We held that the legislation applied even though the timber agreement was separate from the dam construction contract. Clearing the land was an integral, preliminary part of dam construction. *Sitka*, 644 P.2d at 232. If the severance of the two contracts were permitted to defeat the application of the Act, this would have "impermissibly enable[d] a public agency to profit at the expense of workers engaged in activities instrumental to a public construction project." *Id.* at 233.

#### 2. *Alaska State Federation of Labor v. State, Department of Labor*

■ Our decision in *Federation* provides more specific guidance. The State Depart-

ment of Community and Regional Affairs granted $1 million to the Central Council of Tlingit and Haida Indian Tribes of Alaska for the construction of a community hall. The question presented was whether the transfer of funds via the grant invoked the provisions of AS 36.05.010. *Federation*, 713 P.2d at 1210. As in the instant case, interpretation of AS 36.95.010(3)'s language, "under contract for the state," was the central issue in the dispute. *See id.* at 1210. In analyzing the situation in *Federation*, we considered all circumstances surrounding the transaction, rather than focusing on one factor as determinative. In utilizing this approach, we stated: "The Act clearly envisions contracts between the state or a political subdivision, and a contractor for the construction of a specified public project." *Id.* The contract involved a grant, *i.e.* the provision of funds and not construction itself. *Id.* While the structure would be used for a public purpose, the fact that the State would not retain control over or continue to fund the hall after construction belied the existence of a construction contract for the State. *Id.* Furthermore, the State supplied funds that constituted only twenty-five percent of the construction costs. *Id.* at 1211. In holding that this project fell outside the provisions of the Act, we explained:

> [T]he state never owned or controlled, nor intended to control or own the [structure]. The project was not public construction. The Act defines public construction as construction 'under contract for the state.' *This requires significant state involvement.* The evidence, however, shows that the project was intended primarily for private purposes and private control. State involvement was indirect—funding through a grant—and relatively small—only about twenty-five percent of the total cost.

*Id.* at 1211 (emphasis added). Thus, *Federation* yields a list of factors for us to consider

---

7. Alaska Statute 36.95.010(6) additionally provides that " 'state or political subdivision of the state' means any state department, state agency, state university, borough, city, village, school district or other state subdivision."

8. "The fundamental purpose of [Alaska's] Little Davis–Bacon is to assure that employees engaged in public construction receive at least the prevail-

ing wage," the same purpose as under the federal legislation. *City and Borough of Sitka v. Construction and Gen. Laborers Local 942*, 644 P.2d 227, 232 & n. 11 (Alaska 1982). This court has held that because the Federal Davis–Bacon Act is the model for Alaska's legislation, federal precedent is persuasive in the absence of decisions from Alaska's courts. *Id.* at 231.

in determining whether the Inn project constitutes "public construction": (1) the nature of the contract (whether the contract was for the provision of funds or for the construction itself); (2) whether the structure will be used for a public purpose; (3) whether the State will control the structure after construction; (4) whether the State will continue to fund the project after construction; and (5) the relative portion of project financing that the State supplied.[9] Implicit in *Federation* is the notion that these facets of State involvement are not intended to be considered individually. Rather, they are to be weighed in total to determine whether there is "significant state involvement" in the project.[10] *See id.*

### 3. Analysis of factors implicating "significant state involvement" in the construction project

#### a. Nature of the contract

This factor is less germane to the instant case than it was in *Federation*. In that case, the State was providing funds in the form of a grant. 713 P.2d at 1209. Here, there is a construction contract in which ARRC is a participant through its involvement with IAA.

Nevertheless, IAA argues that the existence of a contract between a State entity and a contractor is the "single most important factor" in determining if a project is "public construction." IAA attempts to disguise State involvement in the building contract. IAA argues that it was the partnership that made the agreement, and that ARRC was not a party to the contract.

IAA's characterization is accurate, but ARRC has the ability to significantly influence the actions of IAA. ARRC could have vetoed the construction contract, via the pro-

vision of the partnership agreement that requires a sixty-one percent majority approval of major decisions such as construction and financing of the project. Its participation in securing the funds, and the security it provided to the lenders, may be viewed as a significant factor in obtaining the loan. Additionally, ARRC's involvement in the project resulted in substantial liability for ARRC. Each of these considerations indicates "significant state involvement." Permitting IAA to avoid application of the Act based upon the State's role being masked behind the partnership veil would defeat the "fundamental purpose" of the Little Davis–Bacon legislation: "to assure that employees engaged in public construction receive at least the prevailing wage." *City and Borough of Sitka v. Construction and Gen. Laborers Local 942*, 644 P.2d 227, 232 (Alaska 1982). Furthermore, such a result would encourage similar arrangements in the future, arrangements that could be designed to circumvent the Act's application. This would permit the situation this court warned against in *Sitka* and "impermissibly enable[ ] a public agency to profit at the expense of workers engaged in activities instrumental to a public construction project." *Id.* at 233.

#### b. Public purpose of the project

The day after deciding to participate as a partner in IAA and its development of the Inn project, ARRC's President and CEO issued the following statement to the Railroad's employees:

> I have some interesting news for you today: the Alaska Railroad Corporation plans on getting back into the hotel business. . . . The long-term benefits of this project are what make it most attractive: we augment our passenger business, cre-

**9.** This list of factors is not comprehensive. Situations may demand consideration of additional factors. Furthermore, these illustrative factors need not necessarily be given equal weight. We recognize that the two factors relied on by the dissent (nature of ownership of building or work, and nature of use of the building or work) will often be particularly important or even dispositive in many, but not all, cases.

**10.** Cases from other jurisdictions are of only limited assistance in resolving this dispute.

Varying combinations of aspects of state involvement and differing statutory schemes mean that no one case is likely to be persuasive. *See Penfield Mechanical Contractors v. Roberts*, 119 Misc.2d 105, 462 N.Y.S.2d 393, 395 n. 1 (N.Y.Sup.Ct.1983) ("Authority from other jurisdictions is of limited value due to differing statutory schemes.") *aff'd*, 98 A.D.2d 992, 470 N.Y.S.2d 1021 (1983) *aff'd*, 63 N.Y.2d 784, 481 N.Y.S.2d 72, 470 N.E.2d 870 (1984).

ate a source of real estate income and support our redevelopment of the Ship Creek area. We have a long history of owning hotels such as those that operated at Curry and at Healy. We foresee other hotels being built upon ARRC property, especially near Denali Park or at Fairbanks. I believe hotels are natural enterprises in which the Railroad should invest because they can benefit and support our passenger business. We're convinced we'll be able to provide better customer service and attract more customers by having convenient, affordable accommodations to market with rail trips.

As DOL asserts, this statement indicates that a public corporation was pursuing the Inn opportunity not only because it was a beneficial financial investment, but also because it would enhance the passenger portion of this public corporation's business. Additionally, ARRC's participation in the "hotel business" was an activity that was ongoing.

IAA's position is that this view "confuse[s] the concept of public benefit with those of public purpose and use," as the Inn is a private facility that is not open to public use. In support of this assertion, IAA, while recognizing the benefits of increased employment and downtown development, cites four cases for the proposition that "incidental" public benefits can be distinguished from public purposes. *See Daniels v. City of Fort Smith,* 268 Ark. 157, 594 S.W.2d 238, 240–41 (1980); *Zickuhr v. Bowling,* 97 Ill.App.3d 534, 53 Ill.Dec. 65, 69, 423 N.E.2d 257, 261 (1981); *Gregory v. City of Lewisport,* 369 S.W.2d 133, 135 (Ky.1963); *Erie County Indus. Dev. v. Roberts,* 26 Wage & Hour Cases (BNA) 627, 632, 94 A.D.2d 532, 540–41, 465 N.Y.S.2d 301, 306–07 (1983), *aff'd,* 63 N.Y.2d 810, 482 N.Y.S.2d 267, 472 N.E.2d 43 (1984). The cases that IAA cites for the "incidental"

public benefits rationale all involved government-sponsored bond financing. Therefore, these courts, just as this court in *Federation,* were reviewing situations where the government was merely involved in the financing of a project. Three of these courts specifically mentioned that the governmental entity would retain little control of the project in the long term. *Daniels,* 594 S.W.2d at 240; *Zickuhr,* 53 Ill.Dec. at 69, 423 N.E.2d at 261; *Erie County,* 26 Wage & Hour Cases (BNA) at 631, ——, 94 A.D.2d at 538–40, 465 N.Y.S.2d at 305–06.[11] These situations are distinguishable from the instant case, since ARRC will continue to share in the financial future and management of the Inn.[12] Therefore, these cases are not persuasive.

Furthermore, IAA does not fully address DOL's argument that the motivation for ARRC's involvement is the enhancement of its passenger business, and not merely an investment opportunity. Trades Council cites *Harris v. City of Cincinnati,* 79 Ohio App.3d 163, 607 N.E.2d 15 (1992), for, among other things, that court's recognition that where government involvement in a project is significantly motivated by enhancement of the downtown community (e.g., reconstructing/rehabilitating the slum, improving the area's appearance, attracting businesses and consumers to the downtown), this is a factor in favor of finding that the construction is subject to prevailing-wage laws. *Id.* 607 N.E.2d at 20. Similarly, ARRC was attracted to the Inn project because of its effect on the Ship Creek area re-development project. While IAA's brief does address *Harris,* it does not respond persuasively to Trades Council's reliance on the case. Rather, IAA distinguishes *Harris,* based on the presence of some differing facts and a varying statutory scheme. While these distinguishing fac-

---

11. The dissent relies on *National Railroad Passenger Corp. v. Hartnett,* 30 Wage & Hour Cases 977, 169 A.D.2d 127, 572 A.D.2d 386 (BNA) (1991). Like the cases cited by IAA, the *National Railroad* court also found it important that future financial loss risk, physical destruction, and operational profits all resided with private interests and not the State. *Id.* at 979, 169 A.D.2d at 130–32, 572 N.Y.S.2d at 388–89. "These are the factors that have repeatedly been held sufficient to preclude any determination that a given project constitutes a public works...." *Id.* In the

instant case, these factors are not present, as ARRC shares in these aspects of the operation via its partnership interest.

12. This factor is especially persuasive. Where a State entity shares in operational profits and losses as a result of its participation in a project, this weighs heavily in deeming a project "public construction"; the benefits or costs of such participation will accrue to the State.

tors do exist, they do not nullify *Harris'* implications regarding ARRC's motivation for participating in the project, which in large measure is derived from ARRC's desire to participate in the hotel industry, as compared to other projects, as a complement to its passenger business. This factor weighs in favor of finding that ARRC's participation was in furtherance of a public purpose.

### c. State control of the structure after completion

As discussed, by virtue of its forty percent share of IAA, ARRC enjoys the ability to veto any major partnership decisions. In minimizing the importance of this factor, IAA cites *National Railroad Passenger Corp. v. Hartnett*, 30 Wage & Hour Cases 977 (BNA), 169 A.D.2d 127, 572 N.Y.S.2d 386 (1991), for the proposition that the ability to veto certain project decisions is insufficient to constitute the requisite public control. Again, however, this was only one factor in that court's analysis, and it is important to recognize that the veto authority there had a much more limited scope than in the instant case. *See id.* at 979, 169 A.D.2d at 130–32, 572 N.Y.S.2d at 388–89. Furthermore, the court also noted that it was the private corporation that bore the risk of project loss in the future. *Id.* In the case of IAA, it is ARRC that will absorb its proportionate share of any Inn deficit.

Additionally, ARRC can terminate the lease on one year's notice at any time during the renewal term (i.e., after the first thirty-five years of the lease). Even though this would mean compensating IAA for the fair market value of improvements, this ability still represents a further degree of control for ARRC in the continuing operations of the Inn. If a private individual enjoyed this position in such a venture, his or her involvement would be considered "significant." ARRC should receive a similar evaluation. This is the case even though authority for day-to-day operations is vested in a management company and the general partner.

Considering ARRC's posture in the partnership and the power ARRC wields, other IAA partners simply cannot ignore its desires.

### d. State funding after construction

The State would be obligated to provide funds on a continuing basis only if the Inn ran a deficit, or the debts and obligations of the partnership required further contributions from partners.[13] Therefore, analysis of this factor militates against finding "significant state involvement," as it does not appear that ARRC would have continuing obligations. However, the existence of some ARRC responsibility for partnership losses and obligations makes this factor less persuasive.

### e. Relative portion of financing supplied by the State

This factor weighs in favor of IAA's position. IAA argues that even assuming that ARRC essentially provided the fair market value of the land in exchange for its partnership share, this contribution constitutes no more than 18.3%[14] of the total project costs, an assertion that DOL and Trades Council do not refute. This is significantly less than the twenty-five percent of project costs—and, expressed in other terms, also less than the $1 million—that this court deemed "relatively small" in *Federation*. 713 P.2d at 1211. In this case, most of the funds needed for construction are being obtained from a commercial lender. However, ARRC's participation in the lending process as a co-obligor with 100% liability for the loan amount, a fact that IAA concedes, cannot be overlooked. This pledge was undoubtedly a benefit to IAA in obtaining the loan. Furthermore, it is again important to remember the context of *Federation*: a grant contract, with indirect State funding, and no State obligation to retain control or fund the project upon completion. The percentage of State funding factor alone is not determinative. It is the total mixture of circumstances which must be reviewed in

---

13. In fact, ARRC already provided $485,000, pursuant to a capital call, to fund interim construction costs before the approval of the construction loan. These funds were to be returned once the construction loan closed.

14. $845,000 fair market value of land ÷ ($3,764,732 construction costs + $845,000) = 18.3%.

determining if there is "significant state involvement."

## IV. *CONCLUSION*

■ The totality of circumstances indicates that the State's role provides the significant involvement that this court has deemed necessary in order to conclude that a project is "public construction" subject to Alaska's Little Davis–Bacon Act. *See id.* at 1211. ARRC was a party to a construction contract via its significant participation in IAA. ARRC undertook a significant liability that was of benefit to IAA in obtaining a construction loan for millions of dollars. ARRC's involvement in the project was due not only to an investment incentive, but also due to ARRC's desire to augment its passenger business and further the development of the Ship Creek area. Additionally, ARRC has pursued investment in hotels in a continuing course of action. Consistent with this role, ARRC will continue to participate in the financial future of the Inn. In view of its ability to veto significant, non-routine partnership transactions, ARRC wields substantial power in the functioning of IAA. Even though ARRC's portion of the total project financing was small, the other enumerated considerations indicate that State involvement in the Inn project was "significant." Therefore, the provisions of Alaska's Little Davis–Bacon Act that mandate payment of prevailing wages apply. This fulfills the legislation's fundamental purpose: "to assure that employees engaged in public construction receive at least the prevailing wage." *City and Borough of Sitka v. Construction and Gen. Laborers Local 942,* 644 P.2d 227, 232 (Alaska 1982).

The judgment of the superior court is REVERSED and the case REMANDED to the superior court with directions to enter summary judgment in favor of the appellants.[15]

MATTHEWS, Justice, with whom MOORE, Chief Justice, joins, dissenting.

### I.

While I do not mean to minimize the difficulty of devising a test to determine whether the Little Davis–Bacon Act applies to a construction project, I am concerned that the five-factor approach adopted in today's opinion gives very little guidance as to how future cases should be decided. Persons involved in a project in which the state will or may participate will encounter serious difficulties in attempting to predict whether the Act will apply to their project. The approach may deter building projects in which the state participates alongside private business by making these projects too expensive. The five-factor approach may also engender unnecessary litigation.

In my view, focusing on two factors, the nature of ownership of the building or work and the nature of use of the building or work, is all that is needed for a proper decision in most cases. Only when these two factors point in opposite directions do other factors have to be considered. Further, I think that requiring consideration of five unweighted factors in all cases tends to make it difficult to distinguish hard cases from easy cases. Finally, I am concerned that the opinion sets up deciding whether there is "significant state involvement" as the goal of the five-factor approach, whereas the statutory goal of any analysis should be to determine whether a project constitutes "public construction," or a "public work[ ]." *See* AS 36.05, AS 36.95.010(3).

### II.

The result of today's opinion is not compelled by our prior case law. The multiple factor approach used in the opinion is purportedly derived from our decision in *Alaska State Federation of Labor v. State, Department of Labor,* 713 P.2d 1208 (Alaska 1986). However, *Federation* does not prescribe a multi-factor test. It does discuss factors similar to the factors used in today's opinion. But it does not say which of those factors are important and which are not, and it does not state that a totality of the circumstances test should determine whether the Act applies. Rather, it merely rejects a series of argu-

---

**15.** Because of our disposition of this case, the award of attorney's fees is vacated and this matter remanded for an appropriate award of attorney's fee to the appellants.

ments that were made in favor of applying the Act in that case which correspond to the factors used in today's opinion. *Id.* at 1210–11.

### III.

In my view, focusing on the reason that the Act does not apply to all construction projects helps in making an informed choice as to the types of projects to which the Act should apply.

Alaska's Little Davis–Bacon Act is based on the federal Davis–Bacon Act, which was passed in 1931. In *Universities Research Ass'n v. Coutu*, 450 U.S. 754, 773–74, 101 S.Ct. 1451, 1462–63, 67 L.Ed.2d 662 (1981), the United States Supreme Court explained that the purpose of the Davis–Bacon Act was to prevent contractors from lowering wage rates in local labor markets by importing cheap labor. The Court stated,

> The Act was "designed to protect local wage standards by preventing contractors from basing their bids on wages lower than those prevailing in the area." Passage of the Act was spurred by the economic conditions of the early 1930's, which gave rise to an oversupply of labor and increased the importance of federal building programs, since private construction was limited. In the words of Representative Bacon, the Act was intended to combat the practice of "certain itinerant, irresponsible contractors, with itinerant, cheap, bootleg labor, [who] have been going around throughout the country 'picking' off a contract here and a contract there."

*Id.* at 773, 101 S.Ct. at 1463 (citations omitted). The Court did not explain who the "cheap, bootleg labor" were, where they came from, or why Congress felt that it was fair to benefit local labor at the expense of the "cheap, bootleg labor." The history of the Act indicates that the cheap laborers were mainly Southern Black workers who were used by contractors in the North to work on federal projects.[1] For this reason and others, the Davis–Bacon Act has been criticized as harming minorities and being motivated by racism. *See* John P. Gould & George Bittlingmayer, *The Economics of the Davis–Bacon Act: An Analysis of Prevailing Wage Laws* 8–9, 62–63 (1980); Kenneth M. Roberts, *Labor Law—The Davis Bacon Act, Another Setback for Labor: Building & Construction Trades' Department v. Donovon*, 10 J.Corp.L. 277, 279 (1984).

Merely because the federal Davis–Bacon Act may have roots in protectionism and prejudice does not mean that its Alaska counterpart was enacted for similarly questionable motives. Knowledge of this history does, however, counsel against an easy assumption that this is legislation whose beneficent public purpose is so apparent that it is necessarily entitled to a broad construction.

Our case law states that "[t]he fundamental purpose of Little Davis–Bacon is to assure that employees engaged in public construction receive at least the prevailing wage." *City & Borough of Sitka v. Construction & Gen. Laborers Local 942*, 644 P.2d 227, 232 (Alaska 1982). This statement of purpose does not without further analysis help to determine whether a particular project should be treated as public construction under the Act. Figuring out whether the Act should apply in this case requires discovering what special characteristics public construction has that justify a prevailing wage law covering workers in public construction but not workers in private construction.

As the facts of this case illustrate, the prevailing wage required by Little Davis–Bacon is higher than that which will be paid by at least some cost-conscious owners and contractors. The purpose of the Act is thus to establish a wage floor which increases the income of workers in public construction. It is a "minimum wage law designed for the benefit of construction workers." *United*

---

1. During Congressional debate of the bill that became the Davis–Bacon Act, one Congressman stated:

   Reference has been made to a contractor from Alabama who went to New York with bootleg labor. That is a fact. That contractor has cheap colored labor that he transports, and he puts them in cabins, and it is labor of that sort that is in competition with white labor throughout the country.

   John P. Gould & George Bittlingmayer, *The Economics of the Davis–Bacon Act: An Analysis of Prevailing Wage Laws* 8 (1980).

*States v. Binghamton Constr. Co.,* 347 U.S. 171, 178, 74 S.Ct. 438, 442, 98 L.Ed. 594 (1954), *quoted in Fowler v. City of Anchorage,* 583 P.2d 817, 822 n. 9 (Alaska 1978). With regard to this purpose, the natural question is why the Act does not apply to all construction, public and private. The likely answer is that attempting to apply the Act to private construction would discourage some private construction, which, in turn, would hurt the construction workers whom the Act is intended to benefit. Presumably, this is not a problem with public construction, because the level of public construction is determined by the needs of the public and by political considerations, and is not dependent on the profit motive.

This suggests that projects built with a for-profit motive, especially those that are in competition with projects which are purely private in every sense, should not be included within the statutory term "public construction."

## IV.

A review of the published opinions of the Alaska Attorney General reveals some of the enormously diverse circumstances in which questions concerning the application of the Act arise. I give only a few examples here and indicate the conclusion of the Attorney General:

March 14, 1991

Does the Act apply to a contract awarded by the state for the clean-up of contaminated dirt on private land?

No. The clean-up was not associated with an identifiable public construction project and the property was not intended for public use.

1991 Informal Op.Att'y Gen. 201.

April 18, 1986

Does the Act apply to weatherization contracts paid for by the state for improving "low-income homes"?

No. The property improved is privately owned and not publicly used. (This opinion reversed an opinion of December 30, 1985, which concluded that the Act probably did apply to weatherization contracts because the state and political subdivisions were the contracting parties.

1985 Informal Op.Att'y Gen. 539.)

1986 Informal Op.Att'y Gen. 321.

July 3, 1984

Does the Act apply to a contract between a borough and an oil company under which the oil company agreed to construct a natural gas pipeline paid for by the borough to an industrial center? The oil company will own the pipeline subject to a two-year option in the borough to acquire ownership of the pipeline if it can obtain the necessary permits during that period.

Yes. Even though ownership may remain in private hands, the contract is directly with a public entity. The provision of gas to the industrial center will serve the interest of the general public and the borough hopes ultimately to own the pipeline.

1984 Informal Op.Att'y Gen. 33.

December 21, 1983

Does the Act apply to a construction contract between a rural electrification association (not a state agency or instrumentality) and a contractor for the construction of a substation and transmission line using state funds? The line and substation are necessary for the utilization of a state hydro-electric project but are not currently owned by the state.

Yes. The project "involves the undertaking or provision of traditional government facilities, services, or activities" and thus is covered by the Act because the transmission line and substation are needed to utilize the state-owned hydro-electric project. Further, the author of the Attorney General's opinion "understand[s]" that the line and substation eventually will be owned by the state.

1983 Informal Op.Att'y Gen. 450.

June 9, 1983

Does the Act cover the Alaska State Housing Authority in general and specifically with respect to construction of a senior citizen housing project in Fairbanks?

Alaska State Housing Authority is covered as a state agency. Concerning the senior citizen housing project the Act does

not apply because of an exemption (AS 18.55.110) which applies where federal funding would be jeopardized as it would for the Fairbanks project because HUD regards the state's prevailing wage rates under the Act to be "excessive."

1983 Informal Op.Att'y Gen. 421.

May 23, 1983

Does the Act cover a state grant to the Alaska Native Brotherhood for the construction of a meeting hall?

No. The uses to which the building will be put are not the type that are traditionally provided by government. (This conclusion was subsequently affirmed in *Federation*, 713 P.2d 1208).

1983 Informal Op.Att'y Gen. 395.

March 11, 1983

Does the Act apply to designated grants to private nonprofit corporations to construct buildings such as a daycare center, a "human services complex," and a public works facility?

The answer depends on the nature of the particular project. If the project involves "the undertaking or provision of traditional government facilities, services, or activities it is covered by the Act ... [h]owever, if the work contracted out is not like that traditionally carried out or provided by government, it is not covered...."

1983 Informal Op.Att'y Gen. 235.

I think that a review of these examples illustrates the imprudence of substituting the rubric "significant state involvement" for "public construction." The clean-up contract (1991 Informal Op.Att'y Gen. 201), the weatherization contracts (1986 Informal Op.Att'y Gen. 321), and the designated grants (1983 Informal Op.Att'y Gen. 235), all seem to be completely publicly funded—it would be impossible to say that they are lacking in significant state involvement. Yet, because of the private nature of the use and ownership of the property involved in each case, it seems difficult to argue with the conclusion that the projects do not involve public construction.

The wide variety of fact situations illustrated by these examples counsels against an attempt to devise an all-purpose test to determine when a project is public construction. Still, I think that focusing on what seem to be the two most important factors rather than the five referred to in today's majority opinion should be dispositive in most cases. The factors to which I refer are (1) the nature of the intended use of the public work or building and (2) the nature of the ownership of the public work or building.

I select these two factors for the following reasons. Asking whether the nature of the intended use is public or private in character focuses on the "public" aspect of the statutory terms "public construction" and "public works." *See* AS 36.05, AS 36.95.010(3). Further, intended public use seems to be a *sine qua non* for the application of the Act in the two cases we have decided, *Sitka*, 644 P.2d 227, and *Federation*, 713 P.2d 1208, in the fact situations on which the Attorney General's opinions are based,[2] and in the opinions of other state courts referred to in today's opinion.

Focusing on public ownership of a work or building directs the analysis to the central, though not exclusive, meaning of the statutory term "under contract for the state." *See* AS 36.95.010(3). In *Sitka* and *Federation* the presence or absence of public ownership is consistent with the results reached. Thus, in *Sitka*, the project was publicly owned and the Act applied, and in *Federation* the project was privately owned and the Act did not apply. This pattern, however, does not hold in all of the state cases referred to in today's opinion. In industrial development agency cases projects are publicly owned subject to long-term leases to private businesses. This form of ownership exists to facilitate financing with tax exempt bonds and is held not to require application of prevailing wage statutes. *See Daniels v. City of Fort Smith*, 268 Ark. 157, 594 S.W.2d 238, 239–41 (1980); *Zickuhr v. Bowling*, 97 Ill.App.3d 534, 53 Ill.Dec. 65, 423 N.E.2d 257 (1981); *Gregory v. City of Lewisport*, 369 S.W.2d 133, 135–36

---

**2.** The only exception is the opinion relating to the exemption in AS 18.55.110. *See* 1983 Informal Op.Att'y Gen. 421.

(Ky.1963); *Erie County Indus. Dev. Agency v. Roberts*, 94 A.D.2d 532, 465 N.Y.S.2d 301 (1983), *aff'd*, 63 N.Y.2d 810, 482 N.Y.S.2d 267, 472 N.E.2d 43 (1984); *Penfield Mechanical Contractors, Inc. v. Roberts*, 119 Misc.2d 105, 462 N.Y.S.2d 393 (N.Y.Sup.), *aff'd*, 98 A.D.2d 992, 470 N.Y.S.2d 1021 (1983), *aff'd*, 63 N.Y.2d 784, 481 N.Y.S.2d 72, 470 N.E.2d 870 (1984). In these cases, private use of the project was of overriding importance. Referring to the fact situations presented in the Attorney General's opinions, whether ownership is or is expected to be public is consistent with the results reached in all of the cases except for the designated grants case (1983 Informal Op.Att'y Gen. 235) where despite private ownership, public use was held to control.

Where a project is one in which the two factors, nature of use and nature of ownership, coincide, whether or not to apply the Act can be easily resolved. If a building is intended for a use which is traditionally associated with government and it is government-owned, the contract to build the building should clearly come within the terms of the Act. A state-owned building used for state offices, a municipality-owned building used for a school, and state- or municipality-owned airports or roads are just a few of the numerous examples that fit in this category. Similarly, where the use of a building is one which is not traditionally associated with government and the building is privately owned,

I suggest that the Act clearly should not apply even if there is significant state funding. Examples would include construction with state funds of a privately owned building to be used as a meeting place for a private organization,[3] or a contract between the state and a contractor to improve the energy efficiency of a privately owned building used as a private home.[4]

The difficult cases are those where there is private ownership, but a traditionally public use, or public ownership, but a traditionally private use. An example of the former might include a privately owned building which is subject to a long-term lease to the state for a public use which was entered into prior to construction.[5] Examples of the latter would include a state-owned building which the state has acquired merely for investment purposes but the use of which is private in nature,[6] or where the state acquires by or in lieu of foreclosure a structure dedicated to private uses which must be rehabilitated. These are cases where the factors of ownership and use point in opposite directions. In order to decide whether the projects in such cases are "public construction" additional analysis will be needed.[7]

## V.

I view the project in this case as one in which the use and ownership factors coincide. Both indicate that the construction of the

3. *See Federation*, 713 P.2d 1208.

4. *See* 1991 Informal Op.Att'y Gen. 201, the Attorney General's opinion concerning weatherization.

5. *See Gregory*, 369 S.W.2d at 135–36.

6. *See* AS 37.13.120(g)(16), which permits the Alaska Permanent Fund to own all of a commercial real estate project if the total value of all real estate investments of the fund do not exceed $150 million (if total real estate investments exceed $150 million, equity participation is limited to no more than a sixty-seven percent beneficial ownership interest in any particular project).

7. However, case law from other states suggests that the nature of the use of the project is generally the most important factor. *See Daniels*, 594 S.W.2d at 238–40 (industrial facility backed by public financing not subject to prevailing wage law because it was not for public use); *Zickuhr*, 53 Ill.Dec. at 67–70, 423 N.E.2d at 259–62 (private warehouse paid for with municipal bonds not for public use and consequently not covered by prevailing wage law); *Gregory*, 369 S.W.2d at 135 (industrial plant financed by public bonds not subject to prevailing wage statute, since statute "aimed primarily at construction of buildings for *public use* "); *National R.R. Passenger Corp. v. Hartnett*, 169 A.D.2d 127, 572 N.Y.S.2d 386, 388–90 (1991) (construction of railroad line for private rail company not subject to prevailing wage law even though state provided 40% of financing, had right to veto contractors and significant changes in project, and retained contingent reversionary rights); *Erie*, 465 N.Y.S.2d at 305–06 (printing plant given public financing not "public works" and not covered by prevailing wage law, as "public works" are those projects constructed for public use); *Penfield*, 462 N.Y.S.2d at 395 (private office and storage facility not public works within meaning of prevailing wage statute because it was not for public use).

Comfort Inn is not within the coverage of the Act.

The Comfort Inn is used as a hotel. It is available for use to hotel patrons in a manner which is not at all different from any private hotel and it is in competition with other hotels. Its use is, inarguably, private.[8]

The ownership factor also weighs against application of the Act. The Alaska Railroad Corporation holds a minority ownership position, forty percent, in Inn–Vestment Associates of Alaska, the partnership which owns the Comfort Inn. I consider that minority ownership on the part of the state does not satisfy the public ownership factor for two reasons. First, AS 36.95.010(3) defines "public construction" as construction "under contract for the state," and the partnership is not an alter ego of the state. Second, minority shares in enterprises are typically acquired for investment—profit-making—reasons.[9]

For the above reasons, I conclude that the construction of the Anchorage Comfort Inn was not "public construction" or a "public work" to which the Act applies. Both the use and the ownership of the project indicate that the Act should not apply.

---

8. Today's opinion refers to a use factor but discusses public purpose rather than public use in its application of that factor. The existence of a public purpose is of course a requisite for any state spending. Article IX, section 6 of the Alaska Constitution prohibits any appropriation of public money "except for a public purpose." Consistent with the public purpose clause of our constitution, public money can be spent on private buildings. See *Walker v. Alaska State Mortgage Ass'n,* 416 P.2d 245, 251–53 (Alaska 1966); *DeArmond v. Alaska State Dev. Corp.,* 376 P.2d 717, 721–22 (Alaska 1962). This does not mean, however, that the uses of the private buildings thus benefitted are in any sense public. The distinction between a public purpose which justifies the expenditure of funds and the public use of a project which justifies application of a prevailing wage law has received judicial recognition. See *Daniels,* 594 S.W.2d at 240 ("[W]e find no language ... which indicates that the terms 'public purpose' and 'public use' are synonymous...."); *Zickuhr,* 53 Ill.Dec. at 69, 423 N.E.2d at 261 ("While it seems clear that the city ... will publicly benefit from the employment opportunities afforded by the presence of the new warehouse, and while it is also clear that the provisions of the Bond Act are for a public purpose and benefit, it is just as clear that the actual use of the project is private in nature."); *Erie,* 465 N.Y.S.2d at 306 ("The public purpose of the financing scheme must not be confused with the purely private purpose of the venture itself, its structure and its operation.").

9. This rationale seems appropriate, given that the legislature chose not to extend the Act to private projects, probably because the Act would tend to discourage some private projects. See *supra* § III.