**BOARD OF TRADE, INC./NOME AIRPORT E/W RUNWAY REHABILITATION, Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF LABOR, WAGE AND HOUR ADMINISTRATION, Appellee.**

No. S–10533.

Supreme Court of Alaska.

Jan. 23, 2004.

Kevin T. Fitzgerald, Ingaldson Maassen, P.C., Anchorage, for Appellant.

Toby N. Steinberger, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

1. 968 P.2d 86 (Alaska 1998).

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

On remand from our decision in *Board of Trade, Inc. v. State, Department of Labor & Workforce Development, Wage & Hour Administration*[1] (*BOT I*), the hearing officer determined that an employer must pay prevailing wages under the Little Davis–Bacon Act to workers employed at a quarry located thirteen miles from the site of an airport construction project. The hearing officer concluded that the Cape Nome Quarry activity should be considered "on-site" because it could not have been carried out at an alternative site closer to the airport construction project. Necessary to the hearing officer's determination was his finding that five closer quarry sites could not produce adequate material. The employer challenges the hearing officer's conclusion. Because the hearing officer incorrectly interpreted our guidance on remand and because the factual record demonstrates that the quarry activity could have been carried out at sites closer to the construction project, we reverse and order that judgment be entered in favor of the employer.

## II. FACTS AND PROCEEDINGS

### A. Factual History

The Alaska Department of Transportation and Public Facilities (DOTPF) invited bids from contractors to resurface the East/West runway of Nome's airport. The invitation informed bidders that the project required four layers of material: two inches of asphalt concrete at the top; nine to twelve inches of base course under the asphalt concrete; thirty-two inches of subbase materials; and two types of borrow material at the bottom.

While the invitation did not dictate the source of the contractors' material, it did state that DOTPF was "unaware of any other material sources in closer proximity meeting project requirements" than those at the Cape Nome Quarry, thirteen miles from the airport. DOTPF further represented that

the Cape Nome Quarry was "off-site" for purposes of the Little Davis–Bacon Act.

In July 1991 DOTPF notified Knik Construction Company that it was the lowest bidder on the prime contract for the runway renovation project.[2] At the same time, Board of Trade, Inc. (BOT), a Nome gravel supplier, entered into a contract with Sound Quarry, Inc., the owner of the Cape Nome Quarry, for the removal of material from the quarry to supply the job.[3] Prior to 1991, Sound Quarry had entered into royalty agreements with other contractors for the extraction of material from the Cape Nome Quarry. From 1993 to 1996, after the completion of the runway project, BOT entered into additional royalty agreements with Sound Quarry for the extraction of material from the Cape Nome Quarry.

In August 1991 DOTPF formally awarded Knik the runway renovation contract.[4] Knik and BOT then entered into a formal agreement for the supply of aggregate materials.[5] BOT supplied Knik with aggregate materials for the top two layers of the runway: the asphalt concrete and base course layers. For 1991 and 1992, the overwhelming majority of rock that BOT extracted from the Cape Nome Quarry went to supply the runway project.

For each of the top two layers, DOTPF required that the rock have a sufficiently high degradation mark and low abrasion result. The degradation mark indicates the hardness of the rock and its durability when struck. A higher degradation test result indicates harder rock. DOTPF required that the first two layers have a degradation value of fifty. The abrasion test measures how durable the rock is when exposed to water. A lower test result indicates more durable rock. DOTPF required an abrasion test re-sult of forty for the asphalt concrete layer and of forty-five for the base course layer.

**B. Procedural History**

The Little Davis–Bacon Act requires "that where a public construction contract involves the employment of mechanics, laborers, or field surveyors, they are to be paid the prevailing wage."[6] Public construction is defined as work performed "on-site."[7] In August 1992 the Department of Labor (Department) informed BOT that under regulations interpreting the Little Davis–Bacon Act, the Cape Nome Quarry was considered "on-site" for the public construction project and that employees at the quarry were entitled to compensation at the prevailing wage rate.[8] The Department filed a prevailing wage complaint against BOT because the Department concluded that virtually all of BOT's activities at the quarry were dedicated to the performance of the Nome airport contract, making the activities "on-site" under 8 Alaska Administrative Code (AAC) 30.910(a).[9] That provision defines "on-site" as including areas that are "adjacent" or "nearby."[10] BOT appealed, claiming that the regulation was invalid and, alternatively, that the Department's interpretation of the regulation was wrong.[11]

We upheld the regulation's validity, noting that the Little Davis–Bacon Act expanded the scope of its model, the federal Davis–Bacon Act, to include workers who are not "directly upon the site of the work."[12] But we ruled that the regulation's expanded definition of "on-site" was still geographically based and rejected the Department's argument "that the determination of whether a public project is 'on-site' depends more on the relationship between the contract and the construction project than the geographic

2. *Id.* at 88.

3. *Id.*

4. *Id.*

5. *Id.*

6. *Id.* at 90 (citing AS 36.05.070(a)).

7. AS 36.95.010(3).

8. *Bd. of Trade,* 968 P.2d at 88.

9. *Id.* at 88–89.

10. 8 AAC 30.910(a) (2003).

11. *Bd. of Trade,* 968 P.2d at 89–91.

12. *Id.* at 90.

proximity of the activity to the construction site."[13]

Consequently, we remanded. We recognized that "whether a public construction project is 'on-site' will necessarily be fact specific and decided on a case-by-case basis"[14] and that "the agency should consider the normal meaning of the statutory term 'on-site' and the regulatory terms 'adjacent' and 'nearby.' "[15] We added that "the agency may consider whether the activity could have been carried out at an alternative site closer to the construction"[16] and clarified that whether "the site of an activity is 'nearby' and 'proximate' to the construction depends on the setting, the physical lay of the land, and whether the area is developed or undeveloped."[17]

On remand, the hearing officer held that the Cape Nome Quarry was "on-site" because no closer quarry could consistently produce material that met the project's specifications. The Department adopted the hearing officer's findings of fact and conclusions of law, and the superior court affirmed its decision. BOT again appeals and raises two primary arguments: (1) that the hearing officer misread this court's first ruling by requiring any sites closer than the Cape Nome Quarry to "consistently" produce material that matches the project specifications; and (2) that substantial evidence does not support the agency's factual determination that there are no closer sites that can consistently produce the material.

### III. STANDARD OF REVIEW

 We do not defer to a superior court acting as an intermediate court of appeal.[18] In reviewing an agency's ruling, we apply the "reasonable basis test" for questions of law involving agency expertise but apply the "substitution of judgment test" for questions of law where no expertise is involved.[19] BOT challenges the hearing officer's reading of our first decision. Properly interpreting our ruling does not involve agency expertise; consequently, we apply the "substitution of judgment test" to BOT's legal argument.

 We apply a "substantial evidence test" when reviewing an agency's factual determinations.[20] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[21] Under this standard, "the reviewing court does not reweigh the evidence or choose between competing inferences; it only determines whether such evidence exists."[22]

### IV. DISCUSSION

 "[T]he fundamental purpose of [Alaska's] Little Davis–Bacon [Act] is to assure that employees engaged in public construction receive at least the prevailing wage."[23] Alaska Statute 36.95.010(3) defines "public construction" as: "the on-site field surveying, erection, rehabilitation, alteration, extension or repair, including painting or redecorating of buildings, highways, or other improvements to real property under contract for the state." The Department's regulation defines the term "on-site" to mean: "the physical place where the construction called for in a contract will remain when work on it has been completed and at other adjacent or nearby property used by the contractor or subcontractor in the construction which can reasonably be said to be included in the site because of proximity."[24]

**13.** *Id.* at 92.

**14.** *Id.*

**15.** *Id.*

**16.** *Id.*

**17.** *Id.* at 92–93.

**18.** *Handley v. State, Dep't of Revenue*, 838 P.2d 1231, 1233 (Alaska 1992).

**19.** *Id.*

**20.** *Id.*

**21.** *Storrs v. State Medical Bd.*, 664 P.2d 547, 554 (Alaska 1983).

**22.** *Id.*

**23.** *Bd. of Trade*, 968 P.2d at 90 (quoting *Western Alaska Bldg. & Constr. Trades Council v. Inn–Vestment Assocs.*, 909 P.2d 330, 333 n. 8 (Alaska 1996) (citation omitted)).

**24.** 8 AAC 30.910 (2003).

In *BOT I*, we ruled that the definition of "on-site" must be geographically based.[25] We remanded and instructed the hearing officer to redetermine whether the Cape Nome Quarry was "on-site." The hearing officer was to consider when making his determination the normal meaning of "adjacent" and "nearby," the availability of alternative closer sites, the physical lay-out of the project, and whether the area was developed or undeveloped.[26]

■ The hearing officer apparently narrowed the scope of consideration and only examined whether there were closer alternative sites that could produce the required material.[27] Moreover, in determining whether a closer site existed, the hearing officer formulated a new three-prong test.

> To establish that BOT could have used an alternative site closer to the airport . . . it must be shown . . . that (1) the site was available to BOT during the relevant time frame of August 1991 to September 1992; (2) materials from the site could consistently meet contract specifications, in particular for degradation and . . . abrasion; and (3) BOT was aware that the site could meet contract specifications for the project during the times of its performance on the project.

The first prong of this test corresponds with our explanation that "[i]n evaluating whether the Cape Nome Quarry is 'on-site' . . ., the hearing officer should consider the actual time period in which BOT fulfilled its obligation under its contract with Knik." [28] A site first developed or made available after the contract's performance could not have served as an alternative site during the course of the project. Here the hearing

officer apparently dismissed alternative sites that existed at the time of the runway project that lacked test results showing that they produced material meeting the project requirements.

The third prong of the hearing officer's test asks whether BOT was aware that a closer site met project specifications. But the availability of contemporaneous test results and BOT's subjective knowledge are not relevant to the question at hand: whether the quarry is "on-site"—that is, whether "it is in close geographic proximity to the project footprint." [29] Thus, the hearing officer's inquiry should have been focused on whether there were closer sites capable of producing specified material developed and available at the time of the contractual performance, not on whether BOT knew of any such sites or had examined test data on the material produced at those sites.[30]

■ Finally, the second prong of the hearing officer's test does not correspond with any language in *BOT I*. The second prong asks whether alternative sites could consistently produce specified material. A site's consistency is not the dispositive issue when determining whether it can produce enough material to service a contract. A large site that inconsistently produces the required amount of specified material may be a viable alternative site. Additionally, a site that inconsistently produces the specified material because it has different types of rock in different areas, with strong rock being excavated in one area, might be able to adequately service the contract. In other words, the question is whether alternative sites can produce enough of the required material to meet contract requirements, not whether they can

---

**25.** *Bd. of Trade*, 968 P.2d at 92.

**26.** *Id.* at 92–93.

**27.** The hearing officer did consider the normal meaning of "nearby" and "adjacent." In considering these definitions, however, he simply subsumed their definitions into the consideration of whether there was a closer, alternative site: "Adjacent may or may not imply contact but always implies the absence of anything of the same kind in between."

**28.** *Bd. of Trade*, 968 P.2d at 93.

**29.** *Id.* at 92.

**30.** The hearing officer incorrectly reasoned that if there were a suitable site closer than Cape Nome Quarry, BOT would have investigated the possibility of using that site because excavating and transporting the rock from Cape Nome Quarry was cumbersome and expensive. However, this ignores the fact that BOT was assured that Cape Nome Quarry was off-site, thereby lowering labor costs. BOT's focus on use of the Cape Nome Quarry therefore cannot be viewed as dispositive of the absence of a closer site.

consistently produce it.[31] BOT presented evidence of five alternative sites that it claimed were closer to the airport project than the Cape Nome Quarry. Application of the correct legal standard to the hearing officer's factual findings regarding these five sites reveals that at least two of these sites were closer alternative sites at the time of the contract's performance.

## A. The Alaska Gold Dumpsite

[8] The Alaska Gold Dumpsite is located within two miles of the project. Test results from this site produced degradation results of forty-five, fifty, and fifty-five. The hearing officer dismissed the tests that produced acceptable degradation results because they were conducted in 1998, after the runway project was completed. Therefore, according to the hearing officer, the test results did not prove that BOT, prior to the performance of the contract, was subjectively aware that this site's material met project specifications and the remaining evidence suggested that BOT was unaware that this site had adequate material while it fulfilled the contract. However, as noted above, BOT's subjective knowledge regarding the availability of adequate material is not dispositive.

Second, the hearing officer found that the material contained schist, making it unreliable. According to the hearing officer, "[s]chist is composed of thin layers that tend to come apart very easily, and contains mica and clay minerals that tend to make it a relatively weak rock." But the contract did not preclude rock that met the degradation values and consisted of schist. Consequently, the hearing officer erred in dismissing this site.

## B. The Windfall Pit

The Windfall Pit is located between two and three miles from the project. Again, the hearing officer excluded the use of this site because the degradation tests producing adequate results were ascertained after the project was completed and because BOT was unaware that the Windfall Pit had produced

crushed aggregate exceeding a degradation value of fifty. Again, the lack of subjective knowledge on the part of BOT is not a disqualifying factor.

In sum, the record does not support the hearing officer's determination that the Cape Nome Quarry is in "close geographic proximity" to the project footprint. The Cape Nome Quarry is located more than thirteen miles from Nome and is more remote than other pits capable of producing the specified material. The Cape Nome Quarry thus cannot be viewed as "adjacent" to the airport project when there are alternative sites that separate the quarry from the project footprint. For these reasons, we reverse the decision of the hearing officer that the Cape Nome Quarry was "on-site."

## V. CONCLUSION

Because the hearing officer improperly narrowed the inquiry regarding whether the Cape Nome Quarry was "on-site" for purposes of the Little Davis–Bacon Act and because factual findings indicate that the Cape Nome Quarry was not "on-site," we REVERSE the hearing officer's ruling and order judgment be entered in favor of BOT.

---

31. And even if consistency were an important component, the hearing officer does not reconcile the fact that the Cape Nome Quarry had an inconsistent history of producing the specified material.