*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| ALBORN CONSTRUCTION, INC., | ) |
| | ) Supreme Court No. S-17905 |
| Appellant, | ) |
| | ) Superior Court No. 3AN-18-09876 CI |
| v. | ) |
| | ) O P I N I O N |
| STATE OF ALASKA, | ) |
| DEPARTMENT OF LABOR & | ) No. 7589 – April 8, 2022 |
| WORKFORCE DEVELOPMENT, | ) |
| LABOR STANDARDS & SAFETY | ) |
| DIVISION, and DEBORAH KELLY, | ) |
| in an official capacity, | ) |
| | ) |
| Appellees. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Herbert A. Viergutz and Kevin D. Fowler, Barokas & Martin, Anchorage, for Appellant. Siobhan McIntyre, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellees.

Before: Winfree, Chief Justice, Maassen, Carney, and Henderson, Justices. [Borghesan, Justice, not participating.]

WINFREE, Chief Justice.

## I.   INTRODUCTION

A construction company filed an administrative appeal of a final agency decision that a renovation project on a State-leased office building fell under a wage

statute for public construction projects. During enforcement proceedings an administrative law judge (ALJ) found that the project parties had entered into a sham contract in an attempt to evade the statute's coverage. The State agency charged with enforcing the wage statute adopted the ALJ's findings verbatim as its final agency decision. The construction company appealed; acting as an intermediate court of appeals, the superior court affirmed the final agency decision. The construction company now appeals to us. For the reasons set forth below, we affirm the superior court's decision affirming the agency decision.

## II. FACTS AND PROCEEDINGS

### A. Facts

Juneau I, LLC has leased a Juneau building to the State since 1984, primarily for Department of Transportation and Public Facilities (DOT&PF) offices. In early 2013 Juneau I and the Department of Administration began discussing building renovations in advance of renewing the State's lease.[1] The Department of Administration drafted a lease amendment detailing the State's requested building improvements. In July the Department of Administration and Juneau I executed a lease amendment, known as Amendment 54, specifying building upgrades, significantly raising the State's monthly rent upon completing the renovation, and extending the lease for ten years.

Amendment 54's upgrades included: bringing the commercial building into compliance with more stringent federal Americans with Disabilities Act (ADA) requirements for public buildings, specified window coverings, specified floor coverings, acoustical partitions calibrated to State-approved sound ratings, State-approved signage,

---

[1] *See* AS 36.30.080-.085 (delineating Department of Administration's authority to negotiate, manage, and extend State leases).

and mechanical and electrical system upgrades. DOT&PF's tenant requests, incorporated in Amendment 54, included: 30 new windows meeting specific lighting requirements, a thorough mold inspection, roof repair, and new restrooms with State-approved design. The Amendment required that Juneau I certify compliance with the State's specifications and all State laws, including the set of statutes known colloquially as the Little Davis-Bacon Act.[2]

The Act defines public construction[3] and requires public construction project contractors to pay prevailing wages set by Department of Labor and Workforce Development,[4] whose Labor Standards and Safety Division, Wage and Hour Administration (Wage and Hour), determines the Act's application to projects and invites contractors to request coverage determinations about applicable wages.[5]

Juneau I sought a coverage determination, inaccurately representing the project as merely a routine building upgrade with no specific State requests and asserting

---

[2]     AS 36.05.005 *et seq*.; *see* AS 36.05.010 ("A contractor or subcontractor who performs work on a public construction contract in the state shall pay not less than the current prevailing rate of wages . . . . [determined] by the Department of Labor . . . .").

[3]     AS 36.95.010(3).

[4]     AS 36.05.010; *City & Borough of Sitka v. Constr. & Gen. Laborers Loc. 942* (*City of Sitka*), 644 P.2d 227, 231-32 (Alaska 1982) (explaining Act's history and establishing interpretive guidelines).

[5]     *See* AS 23.10.080 (setting out Division's authority). "Wage and Hour enforces and administers Alaska labor laws . . . . includ[ing] enforcement of . . . public contract laws . . . ." DEP'T OF LAB. & WORKFORCE DEV. https://labor.alaska.gov/lss/ (last visited Feb. 25, 2022). "For questions regarding prevailing wage . . . requirements, please contact the nearest Wage and Hour office." *Laborers' and Mechanics' Minimum Rates of Pay: Pamphlet No. 600*, DEP'T OF LAB. & WORKFORCE DEV. at i (Sept. 1, 2021), https://labor.alaska.gov/lss/forms/Pamphlet_600_Issue_43.pdf.

that it did not believe the renovations were covered by the Act. Wage and Hour determined the project was not covered by the Act based on this information but warned that its determination was subject to change based on new information.

New information soon appeared; the Department of Administration provided Wage and Hour a copy of Amendment 54. Wage and Hour then notified the parties that it considered the entire renovation project to be covered by the Act because the lease extension and rent increase were contingent on the building improvements. Wage and Hour again included the caveat that its determination could change based on new information.

Wage and Hour's coverage determination caused Juneau I to halt the project. Discussions ensued among counsel for the Department of Labor, DOT&PF, the Department of Administration, and Juneau I; in April 2014 Wage and Hour subsequently issued a new coverage determination we refer to as the Bifurcation Letter. The Bifurcation Letter proposed an "unorthodox" solution to "compromise" on coverage questions under the Act and get the project moving. Construction would be bifurcated into the State-required projects covered by the Act and general upgrades not covered by the Act. Wage and Hour determined that seven items fell under the Act: (1) ADA compliance for public entities; (2) remodeling after State occupancy; (3) adding windows to comply with State-specified lighting requirements; (4) renovating office walls to State-specified requests; (5) replacing flooring with State-specified colors and with State-approved materials; (6) painting interior spaces with State-specified colors; and (7) State-specified lighting fixture upgrades. Wage and Hour expressly stated that "the overall construction project as contemplated could be covered" by the Act, and again warned that this determination, like its previous ones, was based on "the information at hand" and "may not be supportable if the circumstances . . . change." Wage and Hour also urged project participants and their contractors to seek private counsel.

The Department of Administration and Juneau I then signed a new lease amendment, Amendment 55, omitting the items the Bifurcation Letter listed as "public construction" covered by the Act. But Juneau I confirmed in a letter (the Companion Letter) to the Department of Administration that the omitted items would be completed, for free, on Juneau I's own initiative. Despite Amendment 55 excluding seven construction items, the rent increase remained the same as in Amendment 54.

Near the end of 2014 Juneau I and Alborn Construction, Inc. executed a roughly $5.5 million construction contract; a clause gave Alborn the right to increased payment if the Act applied to the project. By early 2016 renovations were complete. The Department of Administration completed its inspection, and Juneau I certified compliance with State requirements.

Wage and Hour began investigating Alborn's failure to pay Act wages while the project was ongoing.[6] Wage and Hour requested Alborn's payroll records and subcontractor contracts. Although untimely, Alborn eventually complied with the requests. Wage and Hour completed its investigation and issued a Notice of Findings,[7] explaining that because Alborn had refused to cooperate and had refused to pay Act wages on *any* part of the construction project, including the parts the Bifurcation Letter listed as covered under the Act, Wage and Hour was prepared to treat the *entire* project

---

[6]     *See* AS 36.05.030(a)(1) (granting Department of Labor authority to investigate public construction contract violations); 8 Alaska Administrative Code (AAC) 30.090(a) (providing Division "will investigate potential violations of AS 36 (Public Contracts), on its own motion or on the complaint of any person").

[7]     *See* 8 AAC 30.090(b) (directing investigator to explain alleged Act violation).

as covered by the Act. Wage and Hour requested a meeting to negotiate a resolution,[8] but Alborn did not meet with Wage and Hour. Wage and Hour then referred the matter to the Office of Administrative Hearings for resolution by an independent ALJ.[9]

### B.     Administrative Proceedings

In the administrative proceeding the facts were generally undisputed; the Act's prevailing wage coverage was the only issue and both parties requested summary adjudication, the equivalent of summary judgment in a civil proceeding.[10] Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . [the moving] party is entitled to a judgment as a matter of law."[11] The ALJ issued a summary adjudication decision, applying a five-factor test explained in *Western Alaska Building & Construction Trades Council v. Inn-Vestment Associates of Alaska* (*Western Alaska*) and determining that the Act covered the entire construction project.[12]

---

[8]     *See* 8 AAC 30.090(c) (requiring attempt to resolve enforcement issues through informal conference).

[9]     *See generally* 8 AAC 30.090-100 (governing formal hearing procedure following failure to resolve at informal conference); AS 44.64.060(e)(1) (authorizing adoption of proposed decision as final agency decision).

[10]     *See Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 941-42, 946 (Alaska 2000) (treating summary adjudication and summary judgment interchangeably).

[11]     Alaska R. Civ. P. 56(c) (setting out summary judgment standard); *see, e.g.*, *In re N. Star 1300, LLC*, OAH No. 19-1092-CON at *3 (Dec. 18, 2020) ("Summary adjudication in an administrative proceeding is the equivalent of summary judgment in a court proceeding. It is a means of resolving disputes without a hearing when the central underlying facts are not in contention, but only the legal implications of those facts.").

[12]     909 P.2d 330, 333-34 (Alaska 1996) (outlining five-factor test for determining whether project is "public construction" under Act).

The ALJ concluded that Amendment 55 was an invalid attempt to circumvent the Act's purpose and goals. The Companion Letter and Amendment 55's facially fewer renovations with the same higher lease rate were important considerations leading the ALJ to characterize Amendment 55 as a "sham" contract. The ALJ concluded that Amendment 54 controlled for purposes of the Act's coverage analysis. The ALJ rejected Alborn's argument that the Bifurcation Letter's listing of covered and non-covered items should estop Wage and Hour from arguing that the Act covered the entire project.

The ALJ partially granted a subsequent motion for reconsideration after allowing Alborn to submit additional briefing. The ALJ then clarified parts of the decision without changing the conclusions. The parties stipulated that if the Act applied, Alborn owed $586,316.41 in unpaid wages. The Department of Labor adopted the ALJ's reconsidered decision verbatim as its final agency decision.[13]

## C.    Superior Court Proceedings

Alborn appealed the Department of Labor's agency decision to the superior court,[14] arguing that the ALJ: had no jurisdiction to assess Amendment 55's validity and erroneously concluded the renovations were a "public construction" project; erroneously rejected Alborn's estoppel defense; denied due process by not giving Alborn adequate notice that Amendment 55's validity was in question; and inappropriately issued a summary adjudication.

---

[13]    *See* AS 44.64.060(e)(1) (authorizing adoption of proposed decision as final agency decision).

[14]    *See* AS 22.10.020(d) (granting superior court appellate jurisdiction over final administrative decisions); Alaska R. App. P. 602(a)(2) (allowing appeal from administrative decision to superior court within 30 days).

The superior court reviewed the ALJ's Act coverage analysis, including its grant of summary adjudication, under a reasonable basis standard. The court found no genuine dispute of material fact precluding summary adjudication and considered the ALJ's *Western Alaska* and other analysis thorough and reasonable. The court also applied reasonable basis review in affirming the ALJ's sham contract determination, reasoning that the analysis fell within the Department of Labor's area of expertise.

The superior court reviewed Alborn's estoppel, due process, and jurisdiction claims under a substitution of judgment standard. The court rejected Alborn's estoppel defense, concluding that the Department of Labor was permitted to bring an enforcement action despite the Bifurcation Letter. The court rejected Alborn's due process claim, noting that Alborn had "repeatedly litigated" Amendment 55's validity before the ALJ. The court concluded that the ALJ had authority to consider Amendment 55's validity because determining whether the construction project fell under the Act's coverage was within the Department of Labor's statutory mandate.

The superior court affirmed the Department of Labor's agency decision on all points.

### D.    Alborn's Appeal

Alborn appeals the superior court's decision to us, and we construe Alborn's appeal points as follows: (1) the ALJ's summary adjudication decision was inappropriate because material facts were in dispute; (2) the ALJ erred by determining that Amendment 55 was a sham and that the entire project was covered by the Act; (3) the ALJ erred by rejecting Alborn's argument that the Department of Labor should have been estopped from enforcing the Act; and (4) Alborn had no adequate opportunity to argue that Amendment 55 was valid, violating Alborn's right to due process.

## III. STANDARD OF REVIEW

"When a superior court acts as an intermediate court of appeals, we independently review the administrative decision."[15] The level of deference we afford to administrative decisions depends on the type of determination.[16] If a question of law involves "agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions," reasonable basis review applies, and we will affirm if the administrative decision "is supported by the facts and has a reasonable basis in law."[17] "For questions of law involving no agency expertise, we substitute our 'own judgment for that of the agency even if the agency's decision had a reasonable basis in law.' "[18] We review constitutional questions, including due process claims, using our independent judgment.[19]

## IV. DISCUSSION

### A. Summary Adjudication Was Appropriate.

Alborn contends that material factual disputes precluded summary adjudication and that the ALJ erroneously analyzed the facts when applying the *Western*

---

[15] *Titus v. State, Dep't of Admin., Div. of Motor Vehicles*, 305 P.3d 1271, 1276 (Alaska 2013) (quoting *Alaska Exch. Carriers Ass'n, Inc. v. Regul. Comm'n of Alaska*, 202 P.3d 458, 460 (Alaska 2009)).

[16] *North Slope Borough v. State, Dep't of Educ. & Early Dev.*, 484 P.3d 106, 113 (Alaska 2021).

[17] *Id.* (quoting *Nicolos v. North Slope Borough*, 424 P.3d 318, 325 (Alaska 2018)).

[18] *Id.* (quoting *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987)).

[19] *Anderson v. Alaska Hous. Fin. Corp.*, 462 P.3d 19, 25 (Alaska 2020); *Griswold v. Homer Bd. of Adjustment*, 426 P.3d 1044, 1045 (Alaska 2018).

*Alaska* multifactor legal test to determine the project was "public construction" covered by the Act.[20]  But Alborn alleges no specific factual disputes, and the applicability of a statutory definition is a question of law.[21]  Alborn also asserts that because the ALJ did not order an evidentiary hearing about the State's role in the project and the parties' intent underlying Amendment 55, the ALJ drew "sua sponte" conclusions not based on evidence.  But "[t]here is no right to an evidentiary hearing in the absence of a factual dispute."[22]

As the Department of Labor notes responds, the ALJ explained that at the summary adjudication phase:  "All inferences that could be drawn regarding the truth of the fact will be drawn in Alborn's favor."[23]  The ALJ accepted as true Alborn's contentions that Juneau I "initiated many of the projects that later became Amendment 54" and that "the relative role of the [S]tate in the financing of the project was small compared to the role of Juneau I."  Alborn disagrees with the ALJ's ultimate analysis of the facts in applying the *Western Alaska* test, but Alborn identifies no other material facts that the ALJ did not already assume to be true.

The ALJ concluded that no evidentiary hearing was needed to decide that Amendment 55 was a sham contract because the material facts were in the record,

---

[20]     *See* 909 P.2d 330, 333-34 (Alaska 1996) (explaining five-factor "public construction" test); AS 36.95.010(3) (defining "public construction" under Act).

[21]     *Western Alaska*, 909 P.2d at 332.

[22]     *Church v. State, Dep't of Revenue*, 973 P.2d 1125, 1129 (Alaska 1999) (quoting *Hum. Res. Co. v. Alaska Comm'n on Post-Secondary Educ.*, 946 P.2d 441, 445 n.7 (Alaska 1997)).

[23]     *See Progressive Cas. Ins. Co. v. Skin*, 211 P.3d 1093, 1098 (Alaska 2009) (explaining at summary judgment stage all factual inferences must be drawn in favor of non-moving party).

offered by Alborn itself, undisputed, addressed at the hearing, and addressed again after Alborn's motion for reconsideration. For example, the ALJ noted Alborn's statement that Amendment 55's purpose was avoiding the Act's coverage while keeping the construction project substantially the same, and Alborn states the same to us. Given Alborn's direct admission, an evidentiary hearing about the nature and purpose of Amendment 55 was unnecessary.

Based on the undisputed facts, summary adjudication was appropriate.

**B.      The Act Covered The Entire Project**.

**1.      Reasonable basis is the proper standard of review.**

Alborn contends that the ALJ cannot "claim any particularized [agency] experience and knowledge . . . . to which a reviewing tribunal should pay deference" because the ALJ is not a Department of Labor employee. Alborn asserts that by adopting the ALJ's decision verbatim, the Department of Labor demonstrated a lack of due diligence and failure to insert agency expertise. Alborn further asserts that the only examples of agency expertise in this case are Wage and Hour's Bifurcation Letter and subsequent Notice of Findings. Alborn contends that we thus should defer to only those documents and that we should not consider the ALJ's order an "agency decision."

The Department of Labor responds that adopting the ALJ's order makes it a final agency decision deserving reasonable basis review. The Department of Labor contends that labeling Amendment 55 a sham contract also should be subject to reasonable basis review because the ALJ was determining the Act's coverage rather than resolving a contract claim. The Department of Labor is correct on both points.

Alborn's mistaken contention that the Bifurcation Letter and Notice of Findings are owed some judicial deference as final agency decisions borders on frivolous. The Bifurcation Letter was an offer of "compromise" based on then-current information. The Department of Administration and Juneau I rejected the compromise

and executed Amendment 55 with the intent that Alborn not pay Act wages for *any* part of the project. Wage and Hour then investigated and issued its Notice of Findings, essentially an invitation to negotiate. After it became clear that the dispute would not be resolved informally, the Notice of Findings became the Department of Labor's position before an independent hearing officer.[24] The Department of Labor adopted the ALJ's decision verbatim, agreeing with the legal conclusions. Because the Department of Labor's area of expertise is determining Act coverage and violations[25] and adopting the ALJ's decision makes it a "final agency decision,"[26] we apply reasonable basis review to legal questions involving the decision.[27]

A violation of the Act occurs when a "contractor . . . who performs work on a public construction contract in the state" fails to pay workers the prevailing wage.[28] The Act's coverage depends in part on whether a contract involves public construction.[29] We have warned that "attempts to disguise State involvement in [a] building contract" and "arrangements that could be designed to circumvent the Act's application" may

---

[24]    *See* 8 AAC 30.090-.100 (explaining investigation and hearing process).

[25]    AS 36.05.030 (authorizing Department of Labor to determine Act coverage and violations).

[26]    AS 44.64.060(e)(1) (authorizing adopting proposed decision as final agency decision).

[27]    *See North Slope Borough v. State, Dep't of Educ. & Early Dev.*, 484 P.3d 106, 113 (Alaska 2021) (explaining when reasonable basis review applies).

[28]    AS 36.05.010; *Western Alaska*, 909 P.2d 330, 332 (Alaska 1996).

[29]    *See generally City & Borough of Sitka v. Constr. & Gen. Laborers Loc. 942*, 644 P.2d 227, 229-30, 232 (Alaska 1982) (deciding in prevailing wage appeal from direct superior court action involving construction project divided under two contracts, with work under one contract not covered by Act, that Act covered whole project).

violate the Act.[30]  Evaluating an attempt to evade the Act necessarily involves contract analysis,[31] and the ALJ's limited contractual analysis thus falls "squarely within the scope" of determining the Act's coverage.[32]

### 2.  The Department of Labor reasonably concluded that the renovation project was public construction under the Act.

We have interpreted and applied the Act's public construction requirement only three times.  In *City & Borough of Sitka v. Construction & General Laborers Local 942* we held that a contract to clear timber in advance of a public dam project was covered by the Act because the work was integrated with and "instrumental to" the overall construction project.[33]  In *Alaska State Federation of Labor v. State, Department of Labor* we held that a community hall for private use by Alaska Native groups was not covered by the Act because a public construction project requires "significant [S]tate involvement," and the State's only involvement was a one-time monetary grant.[34]  And in *Western Alaska* we relied on our two previous decisions about "significant [S]tate involvement" to set out a five-factor "public construction" test analyzing:

> (1) [T]he nature of the contract (whether the contract was for the provision of funds or for the construction itself); (2) whether the structure will be used for a public purpose; (3) whether the State will control the structure after

---

[30]   *Western Alaska*, 909 P.2d at 334.

[31]   *See id.*

[32]   *See North Slope Borough*, 484 P.3d at 113 (noting reasonable basis review is appropriate for question of law involving "agency expertise or the determination of fundamental policies within the scope of the agency's statutory functions" (quoting *Nicolos v. North Slope Borough*, 424 P.3d 318, 325 (Alaska 2018))).

[33]   644 P.2d at 232-34.

[34]   713 P.2d 1208, 1211 (Alaska 1986).

construction; (4) whether the State will continue to fund the project after construction; and (5) the relative portion of project financing that the State supplied.[35]

We emphasized that no single factor is dispositive; the factors are viewed together to determine "significant [S]tate involvement."[36] The ALJ in this case analyzed each factor thoroughly, repeatedly referencing the record, and drew all factual inferences in Alborn's favor.[37]

### a.    Factor 1 (nature of the contract)

The ALJ observed that no government agency was a party to the construction contract between Juneau I and Alborn but that a government agency, the Department of Administration, was a party to the lease. Because the Act requires a contract "*for* the [S]tate," not *with* the State,[38] the ALJ concluded that the State did not need to be a party but simply needed to benefit from the construction contract.[39] The ALJ noted that the Act's coverage requires a "contracting agency" that "has entered into

---

[35]    909 P.2d at 333-34.

[36]    *Id.* at 334.

[37]    *See In re N. Star 1300, LLC*, OAH No. 19-1092-CON at *3 (Dec. 18, 2020) (explaining summary adjudication in administrative hearing and summary judgment in court are analogous); *Schikora v. State, Dep't of Revenue*, 7 P.3d 938, 941-42, 946 (Alaska 2000) (treating summary adjudication and summary judgment interchangeably); *cf. Progressive Cas. Ins. Co. v. Skin*, 211 P.3d 1093, 1098 (Alaska 2009) (explaining that at summary judgment phase all factual inferences must be drawn in favor of non-moving party).

[38]    AS 36.95.010(3) (emphasis added).

[39]    *See Western Alaska*, 909 P.2d at 334 (determining State agency was "contracting agency" for Act's purposes even though "not a party to the [construction] contract" because agency was part of larger business arrangement that included contract).

a public construction contract with a contractor."[40]  The ALJ concluded that, as Alborn conceded, there would be no construction contract without the lease; the Department of Administration thus was a contracting agency because it was a party to the lease.[41]

The ALJ then concluded the two agreements established a tenant improvement project undertaken with the State's specific needs in mind, even accepting Alborn's contention that the project's momentum came from Juneau I.  The ALJ's conclusion is well-supported by the State's lease extension being contingent on the improvements.  The ALJ reasonably concluded on the undisputed facts that Factor 1 weighed in favor of a "public construction" finding.

### b. Factor 2 (public purpose) and Factor 3 (State control post-construction)

The ALJ concluded that renovating a building leased exclusively by the State "serves a public purpose."  The ALJ pointed out that the building would be identified as a State building, unlike in *Western Alaska*,[42] and that it had been used exclusively by the State for 30 years.  Alborn does not sufficiently contest this conclusion. Although acknowledging that a tenant improvement project could serve the private purpose of helping a landlord retain a commercially viable building, the ALJ reasonably concluded on the undisputed facts that there was enough of a "public purpose" that Factor 2 weighed in favor of a "public construction" finding.

---

[40]      AS 36.05.900.

[41]      *See City of Sitka*, 644 P.2d 227, 232-34 (Alaska 1982) (determining timber clearing contract was "instrumental to" public dam construction contract and analyzing two contracts together).

[42]      *See* 909 P.2d at 331-32 (explaining State agency in question had investment in commercial hotel).

The ALJ acknowledged that Juneau I, as landlord, maintained a high level of project control but concluded that State control was significant enough for finding material State involvement. Alborn contests this conclusion, focusing on project control *during* construction, in contradiction to *Western Alaska*'s focus on State control *after* construction.[43] Alborn argues first that the Department of Administration, not the ALJ, has the "authority" and "agency expertise" to define the State's level of control over a contract, including application of wage and hour laws. Alborn contends that the Department of Administration "furnishes whatever degree of oversight that a State agency may provide both during construction and throughout the lease term" and that the Department of Administration "acknowledged that no State control was involved . . . on this project."

The Department of Labor responds that the State required upgrades as a condition for extending its lease and that Juneau I asked Alborn to meet the State's specifications. The Department of Labor notes that the renovation included ADA compliance necessary only for public entities and that "[t]he State had the right to approve" upgraded flooring, "final color selections for flooring and carpeting," window placement, and more. Finally, the Department of Labor correctly points out that only it has statutory authority to assess the Act's coverage.[44]

We agree that the Department of Administration's opinion is irrelevant to *Western Alaska*'s test.[45] And we agree that, on the undisputed facts, the State's post-

---

[43]     *Id.* at 336.

[44]     *See* AS 36.05.030 (delineating Department of Labor's authority); AS 36.30.080 (delineating Department of Administration's authority).

[45]     Alborn attempts to recast this argument elsewhere as a claim that the ALJ did not have "jurisdiction" to determine the scope of the Act's coverage because as the

(continued...)

amendment lease control is substantial and material. The ALJ's conclusions that Factors 2 and 3 weigh in favor of a "public construction" finding were reasonable.

### c. Factor 4 (State funding after construction) and Factor 5 (financing provided by State)

The ALJ concluded — and the Department of Labor concedes — that Factor 5 weighed against a "public construction" finding. Accepting as true Alborn's contentions about project financing, the ALJ found that Juneau I and its majority owner provided the vast majority of the funding. The ALJ also accepted that the State provided no initial financing because the rent increase started only after project completion. Weighing Factor 5 in Alborn's favor therefore was reasonable.

But the ALJ concluded that Factor 4, which is forward-looking,[46] weighed in favor of the Act's coverage because over a ten-year period the rent increase would materially defray construction costs. The ALJ distinguished *Western Alaska* and *Alaska Federation* because in those cases there was "no regular income stream" from the State

---

[45]     (...continued)
State's contracting agency the Department of Administration has the authority to determine the State's contracting obligations and because an ALJ cannot "invalidate" a contract. We stress that although the Department of Administration may contract on the State's behalf, the Department of Labor determines whether a contract is covered by the Act. AS 36.05.030 (delineating Department of Labor's authority); AS 36.30.080 (delineating Department of Administration's authority). There is no conflict between these two mandates. As we already have explained, limited contractual analysis for purposes of determining the Act's coverage is well within the Department of Labor's — and therefore the ALJ's — purview.

[46]     *See Western Alaska*, 909 P.2d at 336; *Alaska State Fed'n of Lab. v. State, Dep't of Lab.*, 713 P.2d 1208, 1211 (Alaska 1986) (discussing funding issues from which *Western Alaska* five-factor test was derived).

to the building owner;[47] in contrast, the State will be Juneau I's exclusive tenant for at least ten years. Alborn contends that the rental income stream is not guaranteed because it is subject to annual legislative appropriation. But if Juneau I took this possibility seriously, it likely would not have contracted for the renovations. It thus was reasonable for the ALJ to conclude, on the undisputed facts, that Factor 4 weighed in favor of the Act's coverage.

> **3. The Department of Labor reasonably concluded that a State contract covered the entire "public construction" project and that the Act therefore applied.**

> **a. The conclusion that Amendment 55 was a sham**

After concluding that the Act covered the entire renovation project, the ALJ then asked which lease version controlled: Amendment 54 or Amendment 55? The ALJ correctly considered the broad policies set out in *City of Sitka* and *Western Alaska*. In *City of Sitka* we cautioned against "unduly exalt[ing] form over substance" when we held that a timber clearing contract severed from a larger, State-sponsored dam building contract was still subject to the Act.[48] In *Western Alaska* we similarly disapproved of "attempts to disguise State involvement in the building contract" and cautioned that contracting "arrangements that could be designed to circumvent the Act's application" could violate the Act.[49]

With these cases in mind, the ALJ analyzed whether Amendment 55 was a "bargained-for agreement" or a "sham . . . intended only to affect the rights of the workers on the project." Quoting the Restatement (Second) of Contracts, the ALJ

---

[47] *See Western Alaska*, 909 P.2d at 331-32; *Alaska State Fed'n of Lab.* 713 P.2d at 1209.

[48] 644 P.2d 227, 232-33 (Alaska 1982).

[49] 909 P.2d at 334.

observed that a sham contract exists when the "purported consideration was not in fact bargained for but was a mere formality or pretense."[50]  Applying the law to the undisputed facts, the ALJ concluded that, for purposes of Act coverage, Amendment 55 was a sham.  The ALJ noted Alborn's concession that "the parties removed certain projects from Amendment 54, and Juneau I then promised to do the removed projects for free, in order to avoid the [Act]."

Alborn points out minor differences between Amendment 54 and Amendment 55 combined with the Companion Letter — for example, a different deadline and a few additional projects — as evidence that Amendment 55 was not a sham.  But Alborn also suggests that not seeking a new Act coverage determination after executing Amendment 55 was justified partly because other than the omission of Act-covered items listed in the Bifurcation Letter, there were no major differences.

The ALJ explained why minor differences did not affect the Act coverage analysis:

> If two parties agree to a sale, and then later purport to change their agreement to a mutual exchange of 'gifts' without actually changing the bargain, it does not matter if they also add additional items to their exchange at the time of the sham gift giving.  Here, the important undisputed facts are that (1) the seven [S]tate-specific items listed in Amendment 54 and purportedly removed by Amendment 55 were, in fact, never removed from the bargain because they were promised by Juneau I in the [Companion Letter]; and (2) the rent did not change between Amendment 54 and Amendment 55 even though Amendment 55 purportedly offered a less useful building.

This analysis is further supported by *City of Sitka* and broader Act policies.  Even though the parties in *City of Sitka* had severed the timber clearing contract from the

---

[50]     RESTATEMENT (SECOND) OF CONTRACTS. § 79 (AM. L. INST. 1981).

-19-                              **7589**

original construction contract, we examined the *original* contract — and therefore the project as a whole — when evaluating the Act's coverage.[51] We have explained that the Act "is to the benefit of the employees, not the contracting principals"[52] and was intended to be "liberally construed to effectuate its beneficent purpose."[53]

The Department of Administration clearly never intended to accept the building lease without the State-specified renovations. Amendment 55 may be an enforceable contract between Juneau I and the State, but under any standard of review we agree with the ALJ that Amendment 55 was an attempt to circumvent the Act.

## C.  The Department Of Labor Correctly Denied Alborn's Estoppel Defense.

Equitable estoppel has three general elements: "(1) assertion of a position by conduct or word, (2) reasonable reliance thereon, and (3) resulting prejudice."[54] Courts also may consider "[a] fourth element, . . . [which] is that the estoppel will be enforced only to the extent that justice so requires."[55] Thus, "even where reliance has been foreseeable, reasonable, and substantial, the interest of justice may not be served by the application of estoppel [against the government] because the public interest would be significantly prejudiced."[56]

---

[51]     644 P.2d at 232-33.

[52]     *Id.* at 232.

[53]     *Western Alaska*, 909 P.2d at 333 (quoting *Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Emps. & Helpers, Loc. Union No. 695 v. NLRB*, 361 F.2d 547, 553 n.23 (D.C. Cir. 1966)).

[54]     *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984).

[55]     *Id.*; *see Beecher v. City of Cordova*, 408 P.3d 1208, 1214 (Alaska 2018).

[56]     *See Schneider*, 685 P.2d at 97 (explaining that fourth element is especially

(continued...)

Alborn seeks to estop the Department of Labor's enforcement action. Because the estoppel defense does not fall under the agency's area of expertise,[57] we apply the substitution of judgment standard of review.[58] This standard "permits a . . . court to substitute its own judgment for that of the agency even if the agency's decision had a reasonable basis in law."[59] Alborn appears to raise two estoppel arguments. We address them in turn and conclude both were correctly rejected.

### 1. The "single entity" argument

Alborn first points out that it "relied upon assurances" from the Department of Administration that Act-covered items listed in the Bifurcation Letter "had been omitted from Amendment 55, . . . eliminat[ing] the [Act's] coverage issues." Quoting *Thorsheim v. State*, Alborn argues that the Department of Administration and the Department of Labor should be considered "a single entity."[60] Alborn notes that

---

[56] (...continued) relevant "when considering estoppel against a municipality"); *Beecher*, 408 P.3d at 1214 (same).

[57] *Cf.* AS 23.05.010 (explaining Department of Labor's purpose); AS 36.05.030 (authorizing Department of Labor to set prevailing wage, determine Act coverage and violations, and refer infractions to attorney general for enforcement).

[58] *See North Slope Borough v. State, Dep't of Educ. & Early Dev.*, 484 P.3d 106, 113 (Alaska 2021) (explaining when substitution of judgment standard applies).

[59] *Tesoro Alaska Petrol. Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987).

[60] 469 P.2d 383, 389 (Alaska 1970) ("[T]he Department of Administration and the Department of Fish and Game were both integral parts of a single entity, the State of Alaska.").

statutory law lists both as part of the "[S]tate government"[61] and that the Act defines "contracting agency" as "the [S]tate."[62] Alborn then sets out a seemingly absurd result:

> It was the *State of Alaska* that assured Juneau I that [the Act's] wage coverage was inapplicable to the project . . . . Conversely, it thereafter was the State of Alaska which sought to label the project as "[Act-covered] public construction," even though the State of Alaska, wearing a different hat, had indicated it was not. And presently, it also is *the State of Alaska* which is seeking to recoup the increased wages. (Emphasis in original; citation omitted.)

Alborn contends this supports an estoppel defense based on the Department of Administration's assurances.

But *Thorsheim*, a case about whether the State could be considered a "contractor" in a workers' compensation proceeding, is inapposite.[63] The Department of Administration had negotiated a contract on a state agency's behalf; we held that under the workers' compensation statute the State could not be considered a contractor with respect to its public duties no matter which agency was involved.[64] That narrow decision does not stand for the proposition that separate State agencies cannot have different stances on a particular issue or that State agencies should be considered a single entity in all contexts.[65]

---

[61]    *See* AS 44.17.005 (listing government offices and departments).

[62]    *See* AS 36.05.900 (defining "contracting agency").

[63]    469 P.2d at 385.

[64]    *Id.* at 389-90.

[65]    Such a conclusion would logically contradict state and federal precedent allowing different government branches and agencies to bring lawsuits and administrative enforcement actions against one another; a single party cannot sue itself.
(continued...)

Alborn also misstates the definition of "contracting agency" under the Act as "the [S]tate." The Act defines "contracting agency" as "the [S]tate *or a political subdivision of the* [S]*tate* that has entered into a public construction contract with a contractor,"[66] and "political subdivision" includes "any [S]tate department [or] [S]tate agency."[67] The Act thus clearly envisions the possibility that one arm of the State could enter into an Act-covered construction contract, taking the position that the Act does not apply, and that the Department of Labor, vested with the exclusive authority to determine Act coverage,[68] could bring an enforcement action. In that context, the Department of Labor and the offending "political subdivision" necessarily would have taken opposite positions regarding the Act's coverage, just as happened in this case.

---

[65]        (...continued)
*See, e.g.*, *Beegan v. State, Dep't of Transp. & Pub. Facilities*, 195 P.3d 134 (Alaska 2008) (involving investigation and potential Alaska State Commission for Human Rights (ASCHR) administrative action against DOT&PF); *State, Dep't of Fish & Game, Sport Fish Div. v. Meyer*, 906 P.2d 1365 (Alaska 1995) (involving investigation and potential ASCHR administrative action against Department of Fish and Game), *superseded on other grounds by statute*, ch. 63, § 4, SLA 2006, *as recognized in Huit v. Ashwater Burns, Inc.*, 372 P.3d 904, 914 n.52 (Alaska 2016); *see generally* Michael Herz, *United States v. United States: When Can the Federal Government Sue Itself?*, 32 WM. & MARY L. REV. 893 (1991), https://scholarship.law.wm.edu/wmlr/vol32/iss4/4; *SEC v. Fed. Lab. Rels. Auth.*, 568 F.3d 990, 997-98 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (collecting cases and explaining why government should not always be treated as single entity for litigation purposes).

[66]        AS 36.05.900 (emphasis added).

[67]        AS 36.95.010(6).

[68]        AS 36.05.030 ("The Department of Labor . . . has the authority to determine . . . [if] this chapter is being violated.").

Alborn's "single entity" estoppel theory additionally can be rejected on public interest grounds.[69] Even assuming Alborn met the required elements of reasonable and detrimental reliance on a prior position taken by the unitary "State," application of estoppel would frustrate enforcement of the Act, which was enacted to help construction workers earn better wages.[70] Precluding enforcement cuts against the public interest and the Act's broad policy mandate.

### 2. The final determination argument

Alborn alternatively appears to argue that the Department of Labor took inconsistent positions with respect to the Act's coverage and that enforcement therefore should be estopped. Specifically, Alborn complains that the Department of Labor characterized Wage and Hour's Bifurcation Letter as its "final" determination; that the Bifurcation Letter clearly indicated only some work items would be covered by the Act; and that the Department of Labor changed its position by deciding that all of the work items were covered.

### a. Assertion of a position by conduct or word

The ALJ concluded that Wage and Hour "asserted a position" in its Bifurcation Letter.[71] Wage and Hour "maintain[ed that] the overall construction project as contemplated could be covered" by the Act, but it parsed individual items that would not be covered under a compromise proposal. Less than two weeks later, Wage and Hour characterized the Bifurcation Letter as its "final answer." With respect to the

---

[69] *See Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984) (explaining courts should consider public interest when evaluating estoppel arguments made against government).

[70] *See Western Alaska*, 909 P.2d 330, 332-33 (Alaska 1996) (explaining Act's public interest purpose).

[71] *See Schneider*, 685 P.2d at 97 (asserting position is element of estoppel).

construction project as governed by Amendment 54, the Department of Labor thus took a stance.

### b. Reasonable reliance

We will assume that Alborn — although not a party to the lease negotiations — did rely on the Bifurcation Letter to some degree, as it contends. We conclude that any such reliance was unreasonable.

First, Wage and Hour expressly stated that "the overall construction project as contemplated could be covered" by the Act. It nonetheless made an "unorthodox" offer of "compromise" to allow the project to move forward. Wage and Hour warned that the determination, like previous ones, was "based on the information at hand and may not be supportable if the circumstances of [the] project change"; it urged project participants and their contractors to seek private counsel. Alborn dismisses these warnings as boilerplate language. But given that the original determination in this case changed, assuming new information would not arise and Wage and Hour would not again change its determination was unreasonable.

Second, circumstances changed: (1) Juneau I and the Department of Administration executed Amendment 55, putatively eliminating the "covered" items from the project, and (2) Alborn failed to pay Act wages even for the "covered" items the Bifurcation Letter identified. As the ALJ pointed out and Alborn concedes, the Bifurcation Letter was based on Amendment 54, not Amendment 55. Alborn clearly understood the risk that the project would be covered by the Act, as evidenced by its asserting a right to adjust its contract price with Juneau I if the Act applied.

We reject Alborn's estoppel argument because Alborn's reliance, if any, was unreasonable.

### c. Resulting prejudice

The Department of Labor argues that Alborn cannot show prejudice because it anticipated the Act could apply to the project and included contract language asserting its right to increase the contract price accordingly. Alborn wrote in its project proposal to Juneau I: "Should any circumstances change which result in a requirement to pay prevailing wages, our project total will be amended to reflect the additional expense." Whether Alborn has been or will be made whole by Juneau I following the Department of Labor's enforcement decision and whether being made whole precludes Alborn's ability to show prejudice is unclear. But given Alborn's contract protection, it has not demonstrated any prejudice.

### d. Public interest

Finally, even if Alborn met all the estoppel requirements, its position is contrary to the public interest.[72] The ALJ made this point succinctly:

> Even assuming that in advance of a project the [Department of Labor] has the discretion to bifurcate those aspects of a project for which coverage under the [Act] is uncertain from those that are definite, once an enforcement action is taken, and it becomes clear that the "iffy" aspects are, indeed, covered, the [Department of Labor] cannot ignore the interests of the workers. Although an agency may in some cases compromise uncertain issues to avoid an enforcement action, an adjudicated decision cannot ignore the law.

On the facts of this case, Alborn cannot estop the Department of Labor from bringing an enforcement action on behalf of underpaid workers.[73] Contractors should benefit from

---

[72] *See id.* (explaining courts should consider public interest when evaluating estoppel arguments made against government); *Beecher v. City of Cordova*, 408 P.3d 1208, 1214 (Alaska 2018) (same).

[73] *Cf. North Slope Borough v. State, Dep't of Educ. & Early Dev.*, 484 P.3d

(continued...)

agency opinions to help better budget for upcoming projects, but there is no basis to permit relying on a distortion of an agency opinion to circumvent wage and hour laws.

### D. Alborn Was Not Denied Due Process When Litigating Amendment 55's Validity.

Alborn suggests, although it does not explicitly state, that it was denied due process. Alborn cites a due process case and complains about not having adequate notice that Amendment 55's validity was at issue. "[P]rocedural due process under the Alaska Constitution requires notice and opportunity for hearing appropriate to the nature of the case."[74] Fundamentally, "[p]arties must have notice of the subject of proceedings that concern them."[75] Because due process claims are questions of law, we review them de novo.[76]

Alborn argues that its only opportunity to litigate the ALJ's sham contract ruling was in a motion for reconsideration, leaving no "opportunity to develop the factual basis in support of its defense." Alborn relies on our *Griswold v. Homer Board of Adjustment* decision that due process was denied when the first time the litigant's standing was at issue was on a motion for reconsideration that was later denied.[77] The Department of Labor points out that, unlike in *Griswold*, Alborn's motion for

---

[73]     (...continued) 106, 120 (Alaska 2021) (explaining we will not enforce estoppel doctrine when doing so would require State to contravene law and legislative intent).

[74]     *Griswold v. Homer Bd. of Adjustment*, 426 P.3d 1044, 1045 (Alaska 2018) (alteration in original) (quoting *Price v. Eastham*, 75 P.3d 1051, 1056 (Alaska 2003)).

[75]     *Id.* (alteration in original) (quoting *Price*, 75 P.3d at 1056).

[76]     *Id.*

[77]     *Id.* at 1045-46.

reconsideration was partially granted; that Alborn was permitted to submit additional evidence; and that Alborn submitted over 40 pages of additional briefing.

Alborn had notice and opportunity to litigate the issue, even beyond what the Department of Labor notes. As the ALJ pointed out, Alborn and the Department of Labor litigated the sham contract question during the original administrative proceedings. The Department of Labor had argued that "Amendment 55 did not substantively change . . . coverage under the [Act]," thereby putting Alborn on notice of a sham contract argument. Alborn responded by characterizing the Department of Labor's argument as calling Amendment 55 "superficial" and an example of "evasive drafting." Although the words "sham contract" were not used, both parties' arguments clearly indicate that the Act's coverage — including whether Amendment 55 was designed to evade the Act — was at issue during the initial hearing before the ALJ.

Because there was ample notice and opportunity to be heard regarding the "sham contract" issue, Alborn was not denied due process.

## V. CONCLUSION

The superior court's decision affirming the Department of Labor's decision is AFFIRMED.